IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JEFFRY BUTLER, ET AL.

            :

            :

 v.          :  Civil Action No. DKC 10-2747

            :

DIRECTSAT USA, LLC, ET AL.

            :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this Fair Labor Standards Act collective action case is a motion to decertify the conditionally certified collective action (ECF No. 202), filed by Defendants DirectSAT USA, LLC ("DirectSAT"), UniTek USA, LLC ("UniTek"), and UniTek Global Services, Inc ("UGS"). Also pending are motions to seal filed by Defendants and Plaintiffs.[1] (ECF Nos. 247 and 253). The issues have been fully briefed and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Defendants' motion to decertify, and motion to seal will be granted in part and denied in part. Plaintiffs' motion to seal will be denied.

---

[1] Defendants' motion for summary judgment (ECF No. 257), and the related motions to seal (ECF Nos. 265 and 270), will be resolved in a separate memorandum opinion and order. Plaintiffs' more recently filed motion for reconsideration (ECF No. 275), is not yet ripe.

I.   **Background**

Defendant DirectSAT, a subsidiary of UniTek and UGS, provides satellite installation services to DirecTV customers throughout the country. Plaintiff is a technician who previously installed, upgraded, and serviced DirecTV equipment at customer locations in Maryland, Virginia, and the District of Columbia.[2] Defendants classified Plaintiff's position as non-exempt under federal and state wage and hour laws. Plaintiff began working for Defendants as a technician in October 2007 and held this position until July 20, 2008, when he was promoted to warehouse manager. He typically worked six or seven days per week. Although initially based out of DirectSAT's warehouse in Capitol Heights, Maryland, Plaintiff transferred to the warehouse in Waldorf, Maryland ("D.C. South"), after the Capitol Heights ("D.C. North") warehouse closed.

Technicians were paid pursuant to a "job rate" or "piece rate" system. Technicians would be given assignments at the beginning of the day, go out into the field and complete those assignments, report back as to the work performed, and be paid based on credits that accounted for quantity and type of work,

---

[2] This case originally had two named Plaintiffs: Jeffry Butler and Charles N. Dorsey. In June 2012, Plaintiffs moved to withdraw Mr. Dorsey as a named Plaintiff, explaining that his inactivity suggested that he had abandoned the litigation. (ECF No. 82). The motion was granted on August 7, 2012 (ECF No. 94), leaving Mr. Butler as the only named Plaintiff.

as opposed to an hourly wage.[3]   Technicians were instructed to clock-in when they arrived at their first job-site and clock-out when they left their last job-site of the day.   Plaintiff alleges that he regularly worked more than forty hours per week without proper overtime compensation and, furthermore, was encouraged by Defendants to begin work before the start of his route and continue working after completing his last work order, thereby performing work without being paid.   This sort of work included receiving work orders at home, mapping out his route, preparing satellite dishes, and loading and unloading equipment from his company vehicle.   Plaintiff alleges that Defendants had

---

[3] Federal regulations explain the piece rate system:

> When an employee is employed on a piece-rate basis, the regular hourly rate of pay is computed by adding together total earnings for the workweek from piece rates and all other sources (such as production bonuses) and any sums paid for waiting time or other hours worked (except statutory exclusions). This sum is then divided by the number of hours worked in the week for which such compensation was paid, to yield the pieceworker's "regular rate" for that week. For overtime work the pieceworker is entitled to be paid, in addition to the total weekly earnings at this regular rate for all hours worked, a sum equivalent to one-half this regular rate of pay multiplied by the number of hours worked in excess of 40 in the week.

29 C.F.R. § 778.111(a).

a uniform policy and practice to encourage unpaid work and deny earned overtime.

On October 4, 2010, Plaintiff brought suit against Defendants alleging violations of the Fair Labor Standards Act ("FLSA") (Count I), the Maryland Wage and Hour Law ("MWHL") (Count II), the Maryland Wage Payment and Collection Law ("MWPCL") (Count III), and the District of Columbia Minimum Wage Law ("DCMWL") (Count IV). (ECF No. 1). As to the FLSA claim, Plaintiff sought to represent a collective of all technicians employed by Defendants in Virginia, Maryland, and the District of Columbia during the applicable statute of limitations period for unpaid overtime. Plaintiff alleges that the collective is similarly situated in that they all had similar duties, performed similar tasks, were subjected to the same requirements under the FLSA to be paid overtime wages unless specifically exempted thereunder, were subjected to similar pay plans, were required to work and did work more than forty hours per week, and were not paid one and one-half times their regular rate for overtime worked. As to the Maryland and D.C. law claims, Plaintiff sought to represent a class comprised of all technicians employed by Defendants during the applicable statute of limitations period in Maryland and D.C., respectively. Defendants filed a motion to dismiss and the court, through Memorandum Opinion and Order dated July 6, 2011, granted in part

Defendants' motion, dismissing Plaintiff's MWPCL claim (Count III).  (ECF Nos. 28 and 29).  Plaintiff has seemingly abandoned representing a class on his state law claims as he failed to move for conditional certification by the October 1, 2012 deadline.  (ECF No. 79).  On November 1, 2011, Plaintiff moved for conditional certification of an FLSA collective action and to facilitate notice pursuant to 29 U.S.C. § 216(b).  (ECF No. 41).  On April 10, 2012, Plaintiff's motion was granted and a collective consisting of all technicians based out of Defendants' Waldorf and Beltsville warehouses during the past three years was conditionally certified and notices were disseminated.  (ECF No. 65 and 66).  At one point, fifty-two (52) technicians declared their desire to be opt-in Plaintiffs, but many opt-in Plaintiffs have been dismissed for a variety of reasons, leaving Mr. Butler as the named Plaintiff and twenty-five (25) opt-in Plaintiffs remaining (collectively "Plaintiffs").

On February 3, 2014, Defendants filed a motion to decertify the conditionally certified collective action.  (ECF No. 202). Defendants also filed an unopposed motion to seal certain exhibits attached to their decertification motion (ECF No. 247). Plaintiffs filed an opposition on March 28, 2014 (ECF No. 251), to which Defendants replied on April 11, 2014 (ECF No. 255).

Similar to Defendants, Plaintiffs filed a motion to seal certain exhibits to his opposition (ECF No. 253), which sits unopposed.

## II.  Motion for Decertification

### A.  Standard of Review

Under the FLSA, a collective action for unpaid minimum or overtime wages may be maintained "by any one or more employees for and in behalf of himself or themselves and other employees *similarly situated*."  29 U.S.C. § 216(b) (emphasis added).  "In deciding whether to certify a collective action under the FLSA, courts generally follow a two-stage process."  *Syrja v. Westat, Inc.*, 756 F.Supp.2d 682, 686 (D.Md. 2010).  In the first stage, commonly referred to as the "notice stage," the court makes a "threshold determination of 'whether the plaintiffs have demonstrated that potential class members are 'similarly situated,' such that court-facilitated notice to putative class members would be appropriate."  *Id.* (*quoting Camper v. Home Quality Mgmt., Inc.*, 200 F.R.D. 516, 519 (D.Md. 2000)).  The court granted conditional certification in this case on April 10, 2012.  *See Butler v. DirectSAT USA, LLC*, 876 F.Supp.2d 560 (D.Md. 2012).

In the second stage, following the close of discovery, the "court engages in a more stringent inquiry to determine whether the plaintiff class is [in fact] 'similarly situated' in accordance with the requirements of [Section] 216, and renders a

final decision regarding the propriety of proceeding as a collective action." *Dorsey v. TGT Consulting, LLC*, 888 F.Supp.2d 670, 686 (D.Md. 2012) (*quoting Syrja*, 756 F.Supp.2d at 686) (first alteration in original). Generally, "plaintiffs bear the burden of showing that their claims are 'similarly situated,'" and "district courts have broad discretion to determine whether a collective action is an appropriate means for prosecuting an FLSA cause of action." *Gionfriddo v. Jason Zink, LLC*, 769 F.Supp.2d 880, 886 (D.Md. 2011) (citation omitted). "In considering a motion to decertify alleging dissimilarity of the plaintiff class, courts have considered three factors: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." *Rawls v. Augustine Home Health Care, Inc.*, 244 F.R.D. 298, 300 (D.Md. 2007). "Similarly situated" does not mean "identical," however. *Gionfriddo*, 769 F.Supp.2d at 886 (*citing Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1217 (11th Cir. 2001)).

**B.   Analysis**

**1.   Plaintiffs' Factual and Employment Settings**

"The first factor of the decertification analysis involves an assessment of whether Plaintiffs have provided evidence of a company-wide policy which may violate the FLSA, as well as an

assessment of Plaintiffs' job duties, geographic location, supervision, and salary." *Dorsey*, 888 F.Supp.2d at 687 (*quoting Rawls*, 244 F.R.D. at 300). Defendants submit that the individual and variable nature of the technicians' claims renders them unfit for collective adjudication. They point to what they contend are numerous complications. First, technicians worked varying hours: one technician would work twenty hours in a week while another technician would work more than forty hours that same week. Additionally, because they worked on a piece-rate system, the same technician's weekly hours could fluctuate depending on the amount and types of assignments he received. Defendants maintain that the piece-rate system provides the second complication: because technicians differ in their effort and efficiency, the hourly wage paid to a technician varied from job to job and worker to worker. As an example, they point to testimony from Mr. Adams, who testified that his hours worked, production rate, and compensation rate changed weekly. (ECF No. 202-22, at 11, Trans. 33:6-12). Similarly, Mr. Alston testified that every day on the job was different. (ECF No. 202-24, at 9, Trans. 14:17-19). Third, Defendants allege that under-reporting of time worked may be due to a host of different reasons, some benign and some representing potentially unlawful conduct. For example, they state that Mr. Bovell testified that his general

feeling was that he had to look efficient on his time sheets to keep his job. (ECF No. 202-25, at 10, Trans. 31:7-17). Similarly, Mr. Grainger said that he was advised that appearing more productive would better position him for a promotion. (ECF No. 202-30, at 26, Trans. 44:12-19; *see also* No. 202-34, at 20, Trans. 46:22-24 (Kilson Dep.) (same)). Mr. Stone testified that he falsified hours worked to keep his "score" high which would help him keep his job. (ECF No. 202-46, at 16, Trans. 29:10-18). Defendants point to Mr. Tanoh to show contrast; Mr. Tanoh testified that he underreported his time so that he would get assigned more jobs. He was never told by anyone to underreport his time so as to appear more efficient. (ECF No. 202-47, at 31, Trans. 53:7-22). The fourth complication cited by Defendants is that Plaintiffs do not have records of the time that they actually worked that went unreported on their official time sheets. Defendants contend that more than half of the opt-in Plaintiffs have produced no records at all, let alone actual records demonstrating hours allegedly worked but not recorded. Defendants also point to testimony from technicians who stated that they could not identify which time sheets are accurate and which are not. (*See, e.g.*, ECF Nos. 202-25, at 10, Trans. 31:18-22; 202-47, at 26, Trans. 40:10-14).

Plaintiff contends that he and the twenty-five opt-in Plaintiffs all:

> worked for Defendants as fulltime technicians in the state of Maryland. Plaintiffs typically worked 8-10 hour shifts 5-6 days per week. They shared the same primary duty — performing Direct TV installations and service calls and were paid an hourly rate based upon the jobs they completed and time they worked each week. Plaintiffs were all "home dispatched" which meant they drove their company owned vehicles directly from home to their first job assignment each day and from their last job back home at the end of each day.

(ECF No. 251, at 7 (citations omitted)).   Plaintiffs contend that the evidence demonstrates that they were required to record their start time as the time they arrived at their first job and their end time as the time they completed their last job.   While they were not instructed or permitted to record time worked outside of those times, Plaintiffs maintain that they all were required to perform compensable work before their "start time," including accessing their work assignments and mapping out that day's route, as well as calling that day's customers to confirm the appointment and provide an estimated time of arrival. Similarly, Plaintiffs assert that Defendants required them to perform work after their "end time."   Defendants provided each Plaintiff a vehicle, which was considered the technician's "roaming office;" Plaintiffs contend that Defendants required them to unload their equipment and secure it in their home, and

then inspect the vehicle at the end of each day. Plaintiffs submit that, despite considering the vehicle to be the technician's roaming office, Defendants did not permit Plaintiffs to record the time they spent driving to their first job of the day. Furthermore, "virtually all Plaintiffs who were asked testified that they would assemble satellite dishes at home and off-the-clock." (ECF No. 251, at 12).

In support of their position that the off-the-clock work they performed was done pursuant to official company policy, Plaintiffs point to the testimony of Mr. Kenneth Hildibrand, former General Manager of D.C. North, and Joseph Harley, former Field Supervisor at D.C. South, who each testified that the technician's company-provided van was akin to his rolling office. (ECF No. 251-1, at 8, Trans. 22:16-18; No. 251-2, at 7, Trans. 20:12-16). DirectSAT wanted its technicians at their first job between 8:00 am and 8:30 am. (ECF No. 251-1, at 9, Trans. 26:10-13). Technicians were typically expected to work at least five days a week, but sometimes worked six days a week. (ECF No. 251-1, at 10, Trans. 32:14-19; No. 251-1, at 6, Trans. 20:3-8). Technicians were to list their start time as when they arrived at their first job of the day and list their end time as when they left their last job of the day. (ECF No. 251-1, at 11, Trans. 34:1-14; No. 251-2, at 10, Trans. 34:13 - 35:1). Mr. Hildibrand testified that time spent by technicians in the

morning checking the day's assignments, pre-calling customers,
bringing their meters between the home and vehicle at the
beginning and end of the day, and driving between their home and
the first and last assignment of the day did not count as being
"on-the-clock." (ECF No. 251-1, at 16, 17, Trans. 34:25 - 35:3,
61:1:18, 63:21 - 64:3).  Mr. Hildibrand and Mr. Harley both
testified that the technicians at D.C. South operated in the
same manner and subject to the same rules as the technicians at
D.C. North. (ECF No. 251-1, at 19-20, Trans. 69:15 - 70:1; No.
251-2, at 15, Trans. 52:6 - 53:17).

Walter Hanson, a former General Manager of DirectSAT who
worked out of the Maryland offices stated that "[t]echnicians
regularly performed work before arriving at their first job and
after completing their last job without pay[,] including"
preparing satellite dishes, loading and unloading equipment from
their vehicles, attending weekly meetings at DirectSAT's
offices, receiving their assignments for the day, pre-calling
customers, and washing and maintaining their vehicles. (ECF No.
251-3 ¶ 11).

Furthermore, company policy — reflected in various employee
handbooks — stated that an employee's start time was when he
arrived at work and his end time was when he left his last job.
(ECF No. 252). Technicians were required to call their
customers at the beginning of each day to confirm the job and

12

provide an estimated time of arrival. (ECF No. 252-5). Company policy stated that time spent traveling between home and the first or last job was not considered hours worked, whereas travel between jobs was considered hours worked and was compensable. Overtime compensation was permitted provided the technician obtained advanced authorization. (ECF No. 252-6).

The differences among technicians are not significant or, alternatively, go more toward damages than liability. The fact that some technicians occasionally worked fewer than forty hours a week (even considering the alleged unpaid work) means that Defendants are not liable to these individuals for unpaid overtime pay under the FLSA, but this difference is not so prevalent as to preclude liability to the collective as a whole; instead, it can be addressed in Plaintiffs' individual damages calculations. Similarly, the fact that Mr. Tanoh testified that he underreported his hours because he wanted to receive more jobs does not render the collective dissimilar on this issue, especially in light of the testimony from other Plaintiffs stating otherwise. Furthermore, one's motivation for performing off-the-clock work is not relevant for FLSA purposes if the employer knows or should know about it. *See Falcon v. Starbucks Corp.*, 580 F.Supp.2d 528, 537 (S.D.Tex. 2008); 29 C.F.R. § 785.13 (noting that "it is the duty of the management to exercise its control and see that the work is not performed if

it does not want it to be performed"). Moreover, the fact that Plaintiffs' damages calculations are more difficult because the technicians' hourly rates fluctuated due to the piece-rate system, is not by itself a reason to decertify a collective.

Finally, the absence of records documenting Plaintiffs' off-the-clock work is not fatal to the collective. The FLSA makes clear that employers, not employees, bear the ultimate responsibility for ensuring that employee time sheets are an accurate record of all hours worked by the employees. 29 U.S.C. § 211(c). Plaintiffs bear the burden of proving that they performed overtime work for which they were not compensated, but this burden is not insurmountable. *See Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 686-87 (1946). Where, as here, the employer does not have precise records of the employee's hours,

> an employee has carried out his burden if he
> proves that he has in fact performed work
> for which he was improperly compensated and
> if he produces sufficient evidence to show
> the amount and extent of that work as a
> matter of just and reasonable inference.
> The burden then shifts to the employer to
> come forward with evidence of the precise
> amount of work performed or with evidence to
> negative the reasonableness of the inference
> to be drawn from the employee's evidence.
> If the employer fails to produce such
> evidence, the court may then award damages
> to the employee, even though the result be
> only approximate.

*Id.* at 687-88; *see also Pforr v. Food Lion Inc.*, 851 F.2d 106, 108 (4th Cir. 1988) (The FLSA "does not mandate that a plaintiff

prove each hour of overtime work with unerring accuracy or certainty.").

Defendants further argue that decertification is appropriate because there is no common policy, plan, or scheme to violate the FLSA. Defendants' policy was for technicians to record all time worked and to pay for hours worked, even if it constituted overtime. According to Defendants, Plaintiffs' theory of liability does not involve the application of an unlawful plan, but rather unlawful deviations from a lawful policy. Defendants maintain that Plaintiffs' theory of liability requires individualized factual inquiries because Defendants' liability as to one Plaintiff cannot be generalized to extend to other Plaintiffs, let alone the entire collective. Defendants state that these varying theories are demonstrated by each Plaintiff's testimony which illustrates that technicians received different directions from their supervisors that some followed and others did not. Defendants argue that analyzing each technician's circumstances would essentially lead to separate mini-trials for each technician, making it inappropriate for a collective action. Defendants provide several examples, including the practice of building satellite dishes at home, which they contend that some technicians engaged in while others did not, and that the technicians had varying

reasons for their given practice.[4]   In regard to paperwork,
Defendants note that some technicians reported doing it off-the-
clock, (see ECF No. 202-25, at 11-13, Trans. 38:20 - 40:17
(Bovell Dep.)); (ECF No. 202-34, at 18, Trans. 44:23-25 (Kilson
Dep.)), but another technician reported never doing it at home,
(ECF No. 202-23, at 14-15, Trans. 38:24 - 39:2 (Albu Dep.)).   As
for meetings, Defendants point out that some technicians claim
they did not record warehouse meetings on their timesheets,
while others admit that they did record this time.   (See ECF No.
202-30, at 20, Trans. 35:6-10 (Grainger Dep.)); (ECF No. 202-47,
at 5-6, Trans. 8:20 - 9:5 (Tanoh Dep.)).   Defendants argue that

--------

[4] Some technicians testified that they built them at home
because they were ordered to.  (See ECF No. 202-31, at 20-24,
Trans. 45:20 - 49:13 (Green Dep.)) (noting that supervisors told
him to build dishes before going out into the field); (ECF No.
251-7, at 16, Trans. 54:5-10 (Cromer Dep.)); (ECF No. 251-26, at
35-36, Trans. 34:22 - 35:20 (Rodgers Dep.)).  Another technician
testified that he built dishes at home but did not elaborate as
to his reasons, (ECF No. 252-32, at 9, Trans. 29:4-20 (Newman
Dep.)), while other technicians testified that they assembled
satellite dishes at home in order to be more productive in the
field.  (ECF No. 251-5, at 22, Trans. 21:2-6 (Adams)).  Other
technicians admitted that they built satellites at home but were
not required to do so.  (See ECF No. 202-33, at 16, Trans. 63:2-
13 (Jones Dep.)) (noting that he occasionally built dishes at
home to speed up the process but was not required to do so);
(ECF No. 202-42, at 21, Trans. 40:4 - 41:13 (Nicholls Dep.))
(noting that he built dishes at home but was never instructed
not to record this time)).  Still other technicians were never
so ordered and never built satellite dishes at home.  (See ECF
No. 202-23, at 14, Trans. 38:20-23 (Albu Dep.)); (ECF No. 44:21
— 45:1 (Alston Dep.)).  Still others testified that they did not
have to assemble dishes at home, but preferred to do so because
it helped ensure they would make their appointments.  (ECF No.
251-9, at 14, Trans. 46:1-15 (Leftwood Dep.)); (ECF No. 251-12,
at 13, Trans. 42:3-21 (Shaffer)).

the inconsistency among the collective is so great that there is no effort saved by using the collective action device.

In response, Plaintiffs contend that Defendants are making too much of the differences between and among individual technicians.  In a wage-and-hour action, there are always going to be differences among workers' hours, but that is not a reason to deny certification especially where, as here, the time records for all twenty-six Plaintiffs exist.  "Accordingly, [Plaintiffs contend that] calculating damages will involve a ministerial exercise of adding unpaid pre- and post-shift time to Plaintiffs' time records."  (ECF No. 251, at 26).

Second, Plaintiffs argue that the fact that the piece-rate system results in differing effective hourly wages is not a reason to deny certification because the timesheets exist, which provide the hourly rates for each technician.  Accordingly, Plaintiffs assert that determining the rate of pay and overtime pay is another simple ministerial exercise.

Third, Plaintiffs contend that Defendants are incorrect in their position that the technicians underreported their time for a variety of reasons.  Plaintiffs maintain that the evidence demonstrates that Plaintiffs were instructed and only permitted to record their start time as the time they arrived at the first job site and their end time as the time they completed their last job, despite the fact that they performed compensable work

17

before and after those times.  Finally, it is Defendants' — not Plaintiffs' — responsibility to keep records of the time worked by the technicians.  Plaintiffs assert that this case has "several layers of evidence" showing time worked, including Plaintiffs' testimony, time records, GPS logs, and data from the online assignment tool.  They argue that the supposed variances are not detrimental to the claims, are eclipsed by Defendants' overarching scheme, and can be managed through common proof applicable to all twenty-six Plaintiffs.  Plaintiffs also state that the evidence marshalled to-date demonstrates that "Defendants uniformly required Plaintiffs to work before the start of their first job and after the end of their last job performing the same exact tasks." (ECF No. 251, at 24).

"A collective action does not necessitate that there be no differences among class members, nor does it prohibit individualized inquiry in connection with fashioning the specific relief or damages to be awarded to each class member." *LaFleur v. Dollar Tree Stores, Inc.*, No. 2:12-CV-00363, 2014 WL 934379, at *10 (E.D.Va. Mar. 7, 2014) (*quoting Houston v. URS Corp.*, 591 F.Supp.2d 827, 832 (E.D.Va. 2008) (internal quotation marks omitted)).  The court should determine whether "there is a meaningful nexus that binds Plaintiffs' claims together and that the similarities in their claims outweigh their differences." *Falcon*, 580 F.Supp.2d at 540.  The existence of a common policy

18

"may assuage concerns about plaintiffs' otherwise varied circumstances." *Crawford v. Lexington-Fayette Urban Cnty. Gov't*, No. 06-299-JBC, 2008 WL 2885230, at *5 (E.D.Ky. July 22, 2008) (*quoting Wilks v. Pep Boys*, No. 3:02-0837, 2006 WL 2821700, at *3 (M.D.Tenn. Sept. 26, 2006)); *see also England v. New Century Fin. Corp.*, 370 F.Supp.2d 504, 507 (M.D.La. 2005) ("If there is sufficient evidence of an employer's pattern of subjecting employees to the same improper practice, that would be sufficient to warrant a finding of similarity justifying collective adjudication."). The present case does not involve a situation where Defendants had a policy — that included paying for work done before and after the first and last job of the day — which was administered improperly. Here, Plaintiffs allege, and there is corroborating evidence, that Defendants' policy was that compensation began upon arrival at the first job and ended upon departure from the last job, despite the alleged requirement that they perform various tasks outside of the compensable hours. Whether such a policy existed and its scope will be determined at trial. The evidence demonstrates that there was a policy that technicians pre-call customers before driving to their first job of the day. In regard to building satellite dishes, while not every technician testifies to doing so, a sufficient number of technicians have stated that they spent time off-the-clock building dishes pursuant to either

explicit or implicit instructions from their supervisors. Similarly, Plaintiffs' claims for time spent driving from their homes to their first job sites are sufficiently similar to counsel against decertification. "A fact finder may conclude that while the plaintiffs are not required to perform such tasks, there may be an expectation or unwritten policy that such work be performed." *Crawford*, 2008 WL 2885230, at *7 n.6 (*citing Hill v. Muscogee Cnty. School Dist.*, No. 4:03-CV-60 (CDL), 2005 WL 3526669, at *3 (M.D.Ga. Dec. 20, 2005)). There are certainly differences among the technicians, but they are not so great to defeat the collective mechanism. *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 556 F.Supp.2d 941, 957 (W.D.Wis. 2008) ("If one zooms in close enough on anything, differences will abound."). "While actual hours worked and wages due may vary within the collective, district courts in the Fourth Circuit have clarified that '[d]ifferences as to time actually worked, wages actually due and hours involved' do not preclude a finding of a 'similarly situated' class." *LaFleur*, 2014 WL 934379, at *6 (*quoting Romero v. Mountaire Farms, Inc.*, 796 F.Supp.2d 700, 705 (E.D.N.C. 2011)). "Here, many of the differences to which Defendant[s] point[] go to individual damages, not liability across the entire class. It is well-established that the fact that individualized findings regarding damages may be necessary does not require class

decertification." *Andrako v. U.S. Steel Corp.*, 788 F.Supp.2d 372, 381 (W.D.Pa. 2011) (internal citation and quotation marks omitted).

Defendants make much of the decision decertifying the collective in *Espenscheid*.[5]  *See Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770 (7th Cir. 2013).  The opinions of the district court and the United States Court of Appeals for the Seventh Circuit affirming the decertification reflect that the decisive concern was that the plaintiffs had not presented a realistic possibility of approximating *damages* correctly for a nationwide

---

[5] On July 21, 2014, Defendants filed a motion for leave to file a supplement to their motion to decertify based on Plaintiffs' recent admissions regarding *Espenscheid* and another FLSA case involving DirectSAT technicians: *Farmer v. DirectSat USA, LLC*.  (ECF No. 271).  They contend that Plaintiffs have taken wildly different positions on the import and value of the rulings in these two cases between their opposition to decertify and opposition to summary judgment and, because of that, Defendants should be allowed to file a supplement pointing out these alleged hypocrisies.  Plaintiffs moved to strike this supplement as an impermissible surreply.  (ECF No. 272).

This is a surreply, which may not be filed unless otherwise ordered by the court.  Local Rule 105.2(a).  Although a district court has discretion to allow a surreply, surreplies are generally disfavored.  *Chubb & Son v. C.C. Complete Servs., LLC*, 919 F.Supp.2d 666, 679 (D.Md. 2013).  A surreply may be permitted "when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply." *Khoury v. Meserve*, 268 F.Supp.2d 600, 605 (D.Md. 2003).  Defendants' motion will be denied.  In *Espenscheid*, summary judgment was denied and later the collective was decertified.  There is nothing improper about a party leaning on the ruling that supports his position and distancing himself from the ruling that hurts his position.

collective of 2,341 technicians, given each plaintiff's varied experiences. *See Espenscheid*, 705 F.3d at 773-75 ("The plaintiffs have not indicated how their method of 'representative' proof would enable these workers to be separated when it came time to calculate damages. . . . With no genuinely representative evidence having been suggested by class counsel, 2341 separate hearings loomed even if the district judge bifurcated the proceedings."). Here, with twenty-six Plaintiffs, it is possible to go through each Plaintiff's damages individually if need be. Furthermore, the Seventh Circuit equated the standard to maintain an FLSA collective with that for maintaining a class action pursuant to Fed.R.Civ.P. 23. *Id.* at 771-72. The standards are not the same, however, and many courts have resisted using them interchangeably. *See Dorsey*, 888 F.Supp.2d at 687 & 687 n.14 (collecting cases).

### 2. Individual Defenses

"The individualized defenses factor assesses whether potential defenses pertain to the plaintiff class or whether the potential defenses require proof of individualized facts at trial." *Rawls*, 244 F.R.D. at 300. Defendants argue that the first individualized defense is the statute of limitations, which they argue pertains to Butler and eight opt-in Plaintiffs whom they allege only have a viable FLSA claim if they extend the statute of limitations to three years by proving

willfulness.   If this case proceeds as a collective with nine Plaintiffs having to prove willfulness, Defendants contend that they will be prejudiced as to the remaining opt-in Plaintiffs who do not need to prove willfulness.

These arguments are unavailing.   To the extent Plaintiffs are alleging that their work was uncompensated due to a policy, proof that such a policy existed can be ascertained not by inquiring into each technician, but instead by looking at the collective as a whole and Defendants' overarching policies. Additionally, Defendants will not be prejudiced by letting the collective attempt to prove willfulness for the benefit of only some of the opt-in Plaintiffs.   If an individual plaintiff was proceeding on a claim that fell within the normal two-year limitations period, it would not be considered prejudicial to an employer if, for whatever reason, the employee desired to go beyond what is required by attempting to prove willfulness. Such overachieving is not prejudicial.  *See Johnson v. Wave Comm GR LLC*, No. 6:10-CV-346, 2014 WL 988512, at *5 (N.D.N.Y. Mar. 14, 2014) ("It would be inefficient to deny the collective adjudication of these claims merely because the statute of limitations must be applied to each plaintiff individually when determining damages.").

Defendants next argue that Butler and four opt-in Plaintiffs were also opt-in plaintiffs in the *Espenscheid* case

and, as such, were party plaintiffs.  Consequently, the summary judgment and decertification rulings in that case have a preclusive effect on their individual and collective action claims in the present case.  A defense as to five of twenty-six Plaintiffs is not so great as to counsel in favor of decertification.

Defendants submit that they will also assert a lack of knowledge defense for any off-the-clock work performed by each individual Plaintiff.  Defendants make similar arguments as those rejected above as to the individualized nature of this defense.  It is not apparent, however, why this defense is individualized as opposed to adjudicated on a collective basis.  The question of whether Defendants were aware of the "off the clock" work could be adequately raised at trial by using representative testimony.  *Falcon*, 580 F.Supp.2d at 540.  Defendants also argue that Plaintiffs' depositions reveal discrepancies between their claims and create numerous credibility concerns that strike at the heart of the liability analysis.  "Contradictions in testimony among the plaintiffs 'are matters of credibility for the factfinder, not individualized defenses.'"  *Crawford*, 2008 WL 2885230, at *10 (*quoting Pendlebury v. Starbucks Coffee Co.*, 518 F.Supp.2d 1345, 1362 (S.D.Fla. 2007)).

Finally, Defendants note that Plaintiffs admit that certain workweeks are not at issue in their respective claims, but for varying reasons, including that: their production was below twenty hours and would be ineligible for overtime even if the outside hours were added; they were on light duty, leave of absence, jury duty, or on paid time off. Defendants add that additional hours worked do not necessarily raise an FLSA overtime claim if the added hours still equal less than forty hours per week. These concerns are not so individualized to move the needle away from certification especially where there is evidence of overarching practices. The fact that some technicians worked fewer than forty hours during some weeks can be handled during the damages phase, if and when it is determined that the collective worked any uncompensated time.

### 3.   Fairness and Procedural Considerations

The final factor takes into account fairness and procedural considerations. Under this factor, the court considers:

> the primary objectives of allowance of a collective action under § 216(b), namely (1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity. The court also must determine whether it can coherently manage the class in a manner that will not prejudice any party.

25

*Dorsey*, 888 F.Supp.2d at 689 (*quoting Rawls*, 244 F.R.D. at 302).
Defendants rest their argument on the latter question, arguing
that the record demonstrates that each Plaintiff's claim must be
determined on a case-by-case basis, resulting in individual
mini-trials on liability and damages. They contend that
maintaining the collective will only serve to confuse the jury,
conflate legal and factual issues that must be kept distinct,
and potentially infringe upon Defendants' due process rights.

In response, Plaintiffs argue that Defendants already have
individualized discovery from all twenty-six Plaintiffs and have
the necessary evidence to proceed to trial. They contend that
the alternative to the collective action is twenty-six
individual lawsuits, resulting in piecemeal litigation and
inconsistent adjudications. Plaintiffs note that each trial
would use much of the same evidence and witnesses, to further
their argument that common questions can be answered with common
proof: "Defendants' liability will be established through the
testimony of its own management personnel and its own internal
business records, . . . [and] will be further established
through the testimony of the Plaintiffs." (ECF No. 251, at 29).

Procedural efficiency and fairness counsel in favor of
maintaining this suit as a collective action. The potential
damages in this case are relatively low, and therefore "each
individual Plaintiff would be unlikely to pursue his or her

claim because of the costs involved relative to the damages sought." *Rawls*, 244 F.R.D. at 302; *see also Monroe v. FTS USA, LLC*, 763 F.Supp.2d 979, 996 (W.D.Tenn. 2011) (noting that breaking up claims of 300 plaintiffs would "hinder, if not preclude, their resolution by judicial means"). "'A district court has wide discretion to manage collective actions,' and many fairness and due process concerns can be addressed through trial management, such as the bifurcation of liability and damages, and/or dividing the action into various subclasses." *Thompson v. Bruister and Assocs., Inc.*, 967 F.Supp.2d 1204, 1222 (M.D.Tenn. 2013) (*quoting Alvarez v. City of Chicago*, 605 F.3d 445, 449 (7th Cir. 2010)). While Defendants are correct that perhaps not every task performed by every opt-in Plaintiff can be compensated, these issues can be worked out in the damages phase.

Going forward, this case will be divided into two stages: liability and damages. The liability phase will focus on whether: (1) the collective performed overtime hours without compensation; (2) those worked hours were compensable under the FLSA or, rather, were *de minimis* or preliminary or postliminary to a principal activity; (3) if compensable, Defendants knew or should have known that the collective worked overtime but failed to compensate them for it; and (4) any other defenses raised by

Defendants.    If  liability  is  found  as  to  one  or  more  of  the
eligible  tasks,  the  case  will  proceed  to  phase  two:  damages.

In  the  damages  phase,  Plaintiffs  will  need  to  present
representative  evidence  to  calculate  damages  or,  more  likely,
each  Plaintiff  will  need  to  submit  a  damages  calculation,
subject  to  challenge  by  Defendants.    While  this  phase  could  lead
to  in  essence  twenty-six  mini-trials  on  the  question  of  damages,
it  would  still  be  more  efficient  than  having  twenty-six  mini-
trials  on  damages  *and*  liability.    Defendants  overlook  that  while
the  collective  action  may  not  be  a  perfect  for  all  aspects  of
this  litigation,  it  still  provides  benefits  that  piecemeal
litigation  cannot  offer.    *See  Bobbitt  v.  Broadband  Interactive,
Inc.*,  No.  8:11-cv-2855-T-24  MAP,  2013  WL  5720329,  at  *17
(M.D.Fla.  Oct.  21,  2013)  ("Common  evidence  can  be  used  for  the
liability  phase.    The  fact  that  common  evidence,  by  itself,  will
not  be  sufficient  for  the  damages  phase  (if  liability  is  proven)
does  not  undermine  the  judicial  economy  that  can  be  achieved
from  this  case  proceeding  as  a  collective  action.").
Accordingly,  the  motion  to  decertify  will  be  denied.

III. **Motions to Seal**

Plaintiffs  and  Defendants  have  each  filed  unopposed  motions
to  seal  selected  exhibits  that  accompanied  their  motion  to
decertify  and  opposition.    Defendants  seek  to  seal  Exhibits  1-4,
11-12,  and  47-87  to  their  motion  to  decertify.    These  include  a

full copy of DirectSAT's Employee Policy Manual (ECF No. 203); full copies of DirectSAT's Employee Handbook (ECF Nos. 204-206); a "Payroll Explanation and Compliance Form" completed by every Plaintiff (ECF No. 207); numerous copies of Defendants' rate sheet signed by Plaintiffs (ECF No. 208); copies of paystubs (ECF Nos. 209-211, 231, and 244); copies of Defendants' paycheck verification procedures signed by each Plaintiff (ECF No. 212); personnel documents for various opt-in Plaintiffs and Butler (ECF Nos. 213-215, 218-222, 224-229, and 232-235); timesheets (ECF Nos. 217, 223, 230, and 236-243); and "Manager Reports" which track each technicians' work time (ECF Nos. 245-246).

Plaintiffs seek to seal Exhibits D, O, P, U, V, W, Y, Z, EE & FF to their opposition to the motion to decertify (ECF Nos. 252 to 252-9). These exhibits are a signed acknowledgment by opt-in Plaintiff Murray of Defendants' paycheck verification procedures (ECF No. 252); Defendants' vehicle policy (ECF No. 252-1); Defendants' GPS policy (ECF No. 252-2); a corrective action form prepared for opt-in Plaintiff Murray (ECF No. 252-3); a completed "Truck Kit/Tool Issuance Form" for opt-in Plaintiff Poindexter (ECF No. 252-4); a signed acknowledgement by opt-in Plaintiff Poindexter of Defendants' Technician Cell Phone Policy (ECF No. 252-5); Defendants' timekeeping policy (ECF No. 252-6); Defendants' behavior policy for technicians (ECF No. 252-7); a timesheet for opt-in Plaintiff Adams (ECF No.

252-8); and a paystub for opt-in Plaintiff Adams (ECF No. 252-9).

"The right of public access to documents or materials filed in a district court derives from two independent sources: the common law and the First Amendment." *Va. Dep't of State Police v. Wash. Post*, 386 F.3d 567, 575 (4th Cir. 2004). "The common law presumes a right of the public to inspect and copy 'all judicial records and documents,'" *id.* at 575 (*quoting Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 178, 180 (4th Cir. 1988)), although this presumption "'can be rebutted if countervailing interests heavily outweigh the public interests in access.'" *Id.* (*quoting Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253 (4th Cir. 1988)); *see also Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597-99 (1978). Under this common law balancing analysis, "[t]he party seeking to overcome the presumption bears the burden of showing some significant interest that outweighs the presumption." *Rushford*, 846 F.2d at 253. "Ultimately, under the common law[,] the decision whether to grant or restrict access to judicial records or documents is a matter of a district court's 'supervisory power,' and it is one 'best left to the sound discretion of the [district] court.'" *Va. Dep't of State Police*, 386 F.3d at 575 (*quoting Nixon*, 435 U.S. at 598-99) (second alteration in original).

In addition to the public's common law right of access, the First Amendment provides a "more rigorous" right of access for certain "judicial records and documents." *Va. Dep't of State Police*, 386 F.3d at 575-76; *see also In re Application of the United States for an Order Pursuant to 18 U.S.C. Section 2703(D)*, 707 F.3d 283, 290 (4th Cir. 2013) (explaining the "significant" distinction between the two rights of access). Where the First Amendment does apply, access may be denied "only on the basis of a compelling governmental interest, and only if the denial is narrowly tailored to serve that interest." *Stone*, 855 F.2d at 180.

"For a right of access to a document to exist under either the First Amendment or the common law, the document must be a 'judicial record'" in the first instance. *In re Application*, 707 F.3d at 290. The Fourth Circuit recently held that judicially authored or created documents are "judicial records," as are documents filed with the court that "play a role in the adjudicative process, or adjudicate substantive rights." *Id.* (*citing Rushford*, 846 F.2d at 252; *In re Policy Mgt. Sys. Corp.*, 67 F.3d 296 (4th Cir. 1995) (unpublished table decision)).

Thus, as a substantive matter, when a district court is presented with a request to seal certain documents, it must determine two things: (1) whether the documents in question are judicial records to which the common law presumption of access

31

applies; and (2) whether the documents are also protected by the more rigorous First Amendment right of access. *In re Application*, 707 F.3d at 290; *see also Va. Dep't of State Police*, 386 F.3d at 576.

The sealing of any judicial record must also comport with certain procedural requirements. First, the non-moving party must be provided with notice of the request to seal and an opportunity to object. *In re Knight Publ'g Co.*, 743 F.2d 231, 235 (4th Cir. 1984). This requirement may be satisfied by either notifying the persons present in the courtroom or by docketing the motion "reasonably in advance of deciding the issue." *Id.* at 234. In addition, "less drastic alternatives to sealing" must be considered. *Va. Dep't of State Police*, 386 F.3d at 576; *see also* Local Rule 105.11 (requiring any motion to seal to include both "proposed reasons supported by specific factual representations to justify the sealing" and "an explanation why alternatives to sealing would not provide sufficient protection"). Finally, if sealing is ordered, such an order must "state the reasons (and specific supporting findings)" for sealing and must explain why sealing is preferable over its alternatives. *Va. Dep't of State Police*, 386 F.3d at 576.

Defendants submit that the exhibits related to their motion to decertify should be sealed as they were deemed confidential pursuant to the court-approved Confidentiality Stipulation (ECF

32

Nos. 37 and 38) because they contain confidential and proprietary business information and/or were produced from employee personnel files that contain sensitive personal and commercial information. The full copies of Defendants' employee handbooks and policy manuals will remain under seal. While Plaintiffs cite to their contents as evidence of Defendants' allegedly unlawful policies, Plaintiffs submit the relevant portions of those documents with their oppositions. Consequently, the full copies submitted by Defendants can remain under seal.

The copies of the rate sheet and manager reports will also remain under seal. The information contained in them — the rates paid for different jobs performed and the salary for every technician, whether or not he is a Plaintiff — is not relevant to the disposition of the motion to decertify and is confidential information that can remain under seal. *See Pittston Co. v. United States*, 368 F.3d 385, 406 (4th Cir. 2004)

Defendants' desire to seal the copies of the payroll explanation and compliance form and the paycheck verification procedure is not so obvious. Defendants maintain that this form constitutes confidential and proprietary business and commercial information related to: DirectSAT's payroll system, how DirectSAT compensates its technicians, DirectSAT's formula for calculating a technician's wages, and the procedures in place

for how a DirectSAT technician must report any discrepancies or inaccuracies in his pay. But after reviewing these documents, they appear to be substantially similar to the document addressing piece-rate calculations that was previously found to be undeserving of sealing. Furthermore, Defendants, in their motion, discuss in essence the piece-rate system and rely on Plaintiffs' failure to utilize dispute mechanisms in regard to pay in support of their motion. The crux of this case is how Plaintiffs were paid for their work and whether Defendants knew or should have known about that uncompensated work. While it is true that Judge Schulze previously sealed these documents, her decision was in the context of a discovery dispute, not a motion to decertify a collective. *See Marks v. Licul*, No. DKC 13-0347, 2013 WL 6014026, at *8 (D.Md. Nov. 7, 2013) (whether a document should be sealed is "context-specific rather than content-specific"). Defendants will have fourteen (14) days to file a renewed motion to seal with redactions to Exhibits 11, (ECF No. 207), and 50, (ECF No. 212), to their motion to decertify, or explain why those documents must be sealed in their entirety.

The technicians' employee files will remain under seal. They consist of a checklist for technicians leaving the company and, for Butler, (ECF No. 214), a change of position form showing when he left his technician position to become a warehouse manager. The opt-in Plaintiffs' forms were used by

34

Defendants only to illustrate when various opt-in Plaintiffs stopped working for Defendants and, in some cases, to illustrate potential statute of limitations issues.  They were not relied upon in adjudicating the motion to decertify but the parties are on notice that in a different context there may not be sufficient justification to seal if, for instance, Defendants are asserting a statute of limitations defense and need to prove when a technician stopped working.

Next, Defendants seek to seal in their entirety a collection of timesheets and earnings statements.  Defendants contend that these documents contain personal employee information that should be kept confidential and sensitive, specifically the employee's social security number, marital status, number of exemptions, employee identification numbers and/or home address.  The presence of this information is not by itself a sufficient reason to justify sealing these documents in their entirety.  It is not apparent why these documents cannot be filed in redacted form in accordance with Fed.R.Civ.P. 5.2(a).  In addition, every Plaintiff's home address is listed on either the complaint or their opt-in forms, which have never been filed under seal.  Consequently, Defendants will have fourteen (14) days to file a renewed motion to seal with redactions to the timesheets and earnings statements filed in

conjunction with their motion to decertify, or explain why those documents must be sealed in their entirety.

Plaintiffs, on the other hand, do not attempt to justify their sealed documents beyond stating that have been designated confidential pursuant to the Confidentiality Stipulation. (ECF No. 253). Reliance on a boilerplate confidentiality order, with no attempt to redact portions of the filings, is insufficient for a motion to seal. *See Visual Mining, Inc. v. Ziegler*, No. PWG 12-3227, 2014 WL 690905, at *5 (D.Md. Feb. 21, 2014) (denying motion to seal when the only justification was that the documents are "confidential" under a court-approved Protective Order); *Under Armour, Inc. v. Body Armor Nutrition, LLC*, No. JKB-12-1283, 2013 WL 5375444, at *9 (D.Md. Aug. 23, 2013). Plaintiffs' failure to provide any factual support justifying its motion to seal is especially puzzling given that in an earlier decision in this case, the undersigned noted that a party's reliance on a confidentiality order alone is insufficient to satisfy the "specific factual representations" that Local Rule 105.11 requires. *Butler*, 876 F.Supp.2d at 576 n.18. Plaintiffs will have fourteen (14) days to file a renewed motion to seal with redacted versions or, alternatively, explain why one or more of these documents must be sealed in their entirety. Examining the documents, it is not apparent why portions of Defendants' employee handbook outlining the

timekeeping, cellphone, and other policies relevant and relied upon by both parties in their unsealed briefs should be sealed. Other documents include the timesheets and earnings statements discussed above.  With regard to the employee discipline form and product inventory, it seems readily capable of redaction, in order to make public information aiding Plaintiffs' position.

## IV.  Conclusion

For the foregoing reasons, Defendants' motion for decertification will be denied.  Defendants' motion to seal will be granted in part and denied in part, while Plaintiffs' motion to seal will be denied.  A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
