IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

:

JEFFRY BUTLER, ET AL.

:

v.                                  :    Civil Action No. DKC 10-2747

:

DIRECTSAT USA, LLC, ET AL.

:

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this Fair Labor Standards Act collective action case is a motion for summary judgment (ECF No. 257), filed by Defendants DirectSAT USA, LLC ("DirectSAT"), UniTek USA, LLC ("UniTek"), and UniTek Global Services, Inc ("UGS"). Also pending are motions to seal filed by Defendants and Plaintiff Jeffry Butler. (ECF Nos. 265 and 270). The issues have been fully briefed and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Defendants' motion for summary judgment, and motion to seal will be granted in part and denied in part. Plaintiff Butler's motion to seal will be denied.

**I.    Background**

Defendant DirectSAT, a subsidiary of UniTek and UGS, provides satellite installation services to DirecTV customers throughout the country. Plaintiff Jeffry Butler ("Plaintiff Butler" or "Butler") is a technician who previously installed,

upgraded, and serviced DirecTV equipment at customer locations in Maryland, Virginia, and the District of Columbia.[1]  Defendants classified Butler's position as non-exempt under federal and state wage and hour laws.  Butler began working for Defendants as a technician in October 2007 and held this position until July 20, 2008, when he was promoted to warehouse manager.  He typically worked six or seven days per week.

Technicians were paid pursuant to a "job rate" or "piece rate" system.  Technicians would be given assignments at the beginning of the day, go out into the field and complete those assignments, report back as to the work performed, and be paid based on credits accounting for quantity and type of work, as opposed to an hourly wage.[2]  Technicians were instructed to

---

[1] This case originally had two named Plaintiffs: Jeffry Butler and Charles N. Dorsey.  In June 2012, Plaintiffs moved to withdraw Mr. Dorsey as a named Plaintiff, explaining that his inactivity suggested that he had abandoned the litigation.  (ECF No. 82).  The motion was granted on August 7, 2012 (ECF No. 94), leaving Mr. Butler as the only named Plaintiff.

[2] Federal regulations explain the piece rate system:

> When an employee is employed on a piece-rate basis, the regular hourly rate of pay is computed by adding together total earnings for the workweek from piece rates and all other sources (such as production bonuses) and any sums paid for waiting time or other hours worked (except statutory exclusions). This sum is then divided by the number of hours worked in the week for which such compensation was paid, to yield the pieceworker's "regular rate" for that week.

clock-in when they arrived at their first job-site and clock-out when they left their last job-site of the day.  Plaintiff Butler alleges that he regularly worked more than forty hours per week without proper overtime compensation and, furthermore, was encouraged by Defendants to begin work before the start of his route and continue working after completing his last work order, thereby performing work without being paid.  This alleged off-the-clock work included receiving work orders at home, mapping out his route, preparing satellite dishes, and loading and unloading equipment from his company vehicle.  Butler also alleges that Defendants had a uniform policy and practice to encourage unpaid work and deny earned overtime.

On October 4, 2010, Plaintiff Butler brought suit against Defendants alleging violations of the Fair Labor Standards Act ("FLSA") (Count I), the Maryland Wage and Hour Law ("MWHL") (Count II), the Maryland Wage Payment and Collection Law ("MWPCL") (Count III), and the District of Columbia Minimum Wage Law ("DCMWL") (Count IV).  (ECF No. 1).  As to the FLSA claim, Butler sought to represent a collective of all technicians

---

For overtime work the pieceworker is entitled to be paid, in addition to the total weekly earnings at this regular rate for all hours worked, a sum equivalent to one-half this regular rate of pay multiplied by the number of hours worked in excess of 40 in the week.

29 C.F.R. § 778.111(a).

employed by Defendants in Virginia, Maryland, and the District of Columbia during the applicable statute of limitations period for unpaid overtime.   Butler alleges that the collective is similarly situated in that they all had similar duties, performed similar tasks, were subjected to the same requirements under the FLSA to be paid overtime wages unless specifically exempted thereunder, were subjected to similar pay plans, were required to work and did work more than forty hours per week, and were not paid one and one-half times their regular rate for overtime worked.   As to the Maryland and D.C. law claims, Butler sought to represent a class comprised of all technicians employed by Defendants during the applicable statute of limitations period in Maryland and D.C., respectively. Defendants filed a motion to dismiss and the court, through Memorandum Opinion and Order dated July 6, 2011, granted in part Defendants' motion, dismissing Butler's MWPCL claim (Count III).[3] (ECF Nos. 28 and 29).   Plaintiff Butler has seemingly abandoned representing a class on his state law claims as he failed to move for conditional certification by the October 1, 2012 deadline.   (ECF No. 79).   On November 1, 2011, Butler moved for conditional certification of an FLSA collective action and to

---

[3] On August 26, 2014, Plaintiff Butler filed a motion for reconsideration regarding the dismissal of his MWPCL claim (ECF No. 275), which will be addressed in a separate memorandum opinion.

facilitate notice pursuant to 29 U.S.C. § 216(b).  (ECF No. 41).
On April 10, 2012, Plaintiff Butler's motion was granted and a
collective consisting of all technicians based out of
Defendants' Waldorf and Beltsville warehouses during the past
three years was conditionally certified and notices were
disseminated.  (ECF No. 65 and 66).  At one point, fifty-two
(52) technicians initially declared their desire to be opt-in
Plaintiffs, but many opt-in Plaintiffs have been dismissed for a
variety of reasons, leaving Mr. Butler as the named Plaintiff
and twenty-five (25) others as opt-in Plaintiffs (collectively
"Plaintiffs").

On May 12, 2014, Defendants filed a motion for summary
judgment as to the *only* named Plaintiff Jeffry Butler's claims.
(ECF No. 257).  Butler filed an opposition on July 16, 2014 (ECF
No. 268), to which Defendants replied on August 15, 2014 (ECF
No. 273).  The parties each filed unopposed motions to seal
certain exhibits attached to their filings.  (ECF Nos. 265 and
270).

## II.  Motion for Summary Judgment

### A.    Standard of Review

A motion for summary judgment will be granted only if there
exists no genuine dispute as to any material fact and the moving
party is entitled to judgment as a matter of law.  *See*
Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  The moving party bears the burden of showing that there is no genuine dispute as to any material fact.  No genuine dispute of material fact exists, however, if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof.  *Celotex*, 477 U.S. at 322–23.  Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine dispute for trial.

In *Anderson v. Liberty Lobby, Inc.*, the Supreme Court of the United States explained that, in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  477 U.S. at 249 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.  Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.

6

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*quoting United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). The mere existence of a "scintilla" of evidence in support of the non-moving party's case is not sufficient to preclude an order granting summary judgment. *See Anderson*, 477 U.S. at 252.

A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F.Supp.2d 373, 375 (D.Md. 2001) (citation omitted). Indeed, this court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *See Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) (*quoting Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).

### B. Analysis

### 1. Statute of Limitations

Defendants first argue that Butler's claim is barred by the applicable statute of limitations. The FLSA provides for a two-tiered statute of limitations, depending on the standard of culpability a plaintiff can prove. 29 U.S.C. § 255(a). By

default, a plaintiff must commence an FLSA action within two years of the date the cause of action accrued.   If Butler can prove a "willful violation" of the FLSA, however, the period to commence an FLSA cause of action is extended to three years. *Id.*

In his answers to Defendants' interrogatories, Butler states that Defendants employed him as a technician from August 2007 to July 20, 2008.[4]  (ECF No. 264).   Thus, the outer limits of his FLSA claim extend to July 20, 2010, or to July 20, 2011, if he can prove willfulness.   Butler filed his complaint in October 2010.   Defendants contend, however, that because Butler is bringing a collective action, the statute of limitations did not toll until he filed a consent form opting-in to the collective action, despite the fact that he is a named Plaintiff.

At first glance, Defendants' argument seems needlessly formalistic, but it cannot be denied that "[c]ourts have repeatedly interpreted [29 U.S.C. §] 256 as requiring all plaintiffs in an FLSA collective action, whether named or unnamed, to file written consents to toll the statute of limitations." *Faust v. Comcast Cable Commc'ns Mgmt., LLC*, No. WMN-10-2336, 2013 WL 5587291, at *3 (D.Md. Oct. 9, 2013).

---

[4] Butler worked as a warehouse manager from July 20, 2008 to his termination in September 2009.  He does not claim that any FLSA violations stemmed from his time as a warehouse manager.

Indeed, the United States Court of Appeals for the Fourth Circuit noted, albeit in an unpublished opinion, that "[c]ase authority has interpreted the statutory sections as requiring all plaintiffs in a collective action under the FLSA to file written consents for statute of limitations purposes. . . . [S]igned consents filed after the filing of the complaint do not relate back to the date the complaint was filed." *In re Food Lion, Inc.*, 151 F.3d 1029, 1998 WL 322682, at *13 (4th Cir. June 4, 1998) (unpublished table decision). These holdings are based on the precise language of the FLSA, which states that "[n]o employee shall be a party plaintiff to a [collective] action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b); *see also id.* § 256 (stating that a collective action is commenced on the date on which complaint is filed if named plaintiff filed his written consent to become a party plaintiff or, if that situation does not exist, the subsequent date on which written consent is filed with the court).[5] Defendants contend that because Butler never filed a consent form and more than three years have passed since the

---

[5] The situation is different for an individual action, even one with several plaintiffs. In individual actions, there is no need for consents to be filed and the action is deemed commenced when the complaint is filed. *See Food Lion*, 1998 WL 322682, at *13.

last alleged wrongful action, he cannot bring an FLSA claim on behalf of a collective.

In his opposition, Butler does not dispute the overarching legal principle that every plaintiff to an FLSA collective action, even named plaintiffs, must file a written consent to be a party.  Nor does he contend that he has ever filed a formal consent form.  Instead, Butler argues that his verified answers to interrogatories and signed declaration provide the necessary consent to opt-in.

In *Faust*, Judge Nickerson collected what authority there is on the issue of what form a consent to participate in a collective action can take:

> The FLSA requires only that a plaintiff give consent, to be filed with the court, in writing.  29 U.S.C. § 216(b).  "While it is clear that some document in addition to the complaint must be filed, it is not clear what form the written consent must take, especially when the alleged party plaintiff is a named plaintiff."  *D'Antuono v. C & G of Groton, Inc.*, No. 3:11cv33 (MRK), 2012 WL 1188197, at *2 (D.Conn. Apr. 9, 2012).  Courts have generally shown "considerable flexibility" with respect to the form of consent, *Manning v. Gold Belt Falcon, LLC*, 817 F.Supp.2d 451, 454 (D.N.J. 2011), requiring only that "the signed document verif[y] the complaint, indicate[] a desire to have legal action taken to protect the party's rights, or state[] a desire to become a party plaintiff."  *Perkins v. S. New England Tel. Co.*, No. 3:07-cv-967, 2009 WL 3754097, at *3 n.2 (D.Conn. Nov. 4, 2009).

10

*Faust*, 2013 WL 5587291, at *5 (alterations in original).  Butler filed his signed answers to interrogatories on October 31, 2011, and his declaration in support of conditional certification on November 1, 2011.  (ECF Nos. 257-4 and 257-5).

Butler's interrogatory answers and declaration are sufficient to constitute written consent to be a party plaintiff.  The documents refer to the facts underlying the litigation and express his view that the alleged practices applied to all technicians.  Furthermore, the signed documents filed by Butler are similar to those accepted as sufficient in *Faust*.  *See* 2013 WL 5587291, at *6.

Defendants also argue that even accepting these documents as Butler's written consent that tolls the statute of limitations, none of the alleged wrongdoing falls within the three-year statute of limitations.  Butler was last a technician on July 20, 2008, but he did not constructively opt-in until October 31, 2011, more than thirty-nine months later, and three months after the three-year statute of limitations ended.  Consequently, they contend that Butler's claim is time-barred because it was filed outside the three-year limitations period.

In response, Butler argues that Defendants overlook a critical fact: he opted-in to an identical FLSA case against these same Defendants in the United States District Court for the Western District of Wisconsin: *Espenscheid v. DirectSAT USA,*

11

*LLC, et al.* As the undersigned previously noted, the defendants are the same in both cases and there is substantial overlap in the claims. *Butler v. DirectSat USA, LLC*, 800 F.Supp.2d 662, 666 (D.Md. 2011). Butler filed his written consent in the other action on July 28, 2010 and opted-out on January 12, 2011.[6] He argues that his FLSA statute of limitations equitably should be tolled for the 168 days he was a plaintiff in *Espenscheid*.

"The statute of limitations for a plaintiff in a collective action is tolled after the plaintiff has filed a consent to opt in to the collective action, and begins to run again if the court later decertifies the collective action." *Green v. Harbor Freight Tools USA, Inc.*, 888 F.Supp.2d 1088, 1105 (D.Kan. 2012). Where Defendants are the same and there is substantial overlap between the claims, tolling is sensible given that "the opt-in individual could have initiated his or her own action . . . [a]nd Defendants are not prejudiced because Defendants were on notice of the potential claims at the point that the individuals opted in." *Burch v. Qwest Commc'ns Int'l*, No. 06-3525 (MJD/AJB), 2010 WL 529427, at *5 (D.Minn. Feb. 4, 2010). Defendants argue that Butler has taken inconsistent positions on whether the claims in *Espenscheid* and this case are the same.

---

[6] The *Espenscheid* case was not decertified until May 23, 2011. Defendants have taken the position that Mr. Butler's opt out notice was ineffective, which would mean that he remained a plaintiff in that case until decertification several months later.

The cases are sufficiently similar, however, so that the time a plaintiff spent as a plaintiff in *Espenscheid* should not count as part of the statute of limitations period.  The time that Butler was an opt-in party in *Espenscheid* will toll the statute of limitations for this case.  After accounting for the minimally applicable 168 day tolling period, Butler's statute of limitations period is approximately forty-one and one-half months (three years and 168 days), which extends the limitations period back to May 16, 2008 (three years and 168 days prior to October 31, 2011).  Because Butler was a technician — and subjected to policies allegedly violative of the FLSA — through July 20, 2008, he has viable FLSA claims for the period between May 16, 2008 and to July 20, 2008, provided he can extend the FLSA's statute of limitations to three years by proving willfulness.

Defendants next argue that, even accepting Butler's version of the limitations period, his claim is untimely unless he can prove willfulness, which he cannot.  Butler does not dispute that there is no scenario by which he falls within the normal two-year statute of limitations.  Therefore, the only way his claim is timely is to extend the statute of limitations to three years by proving that Defendants committed willful violations of the FLSA.  To establish willfulness, Butler must show that "the employer either knew or showed reckless disregard for the matter

13

of whether its conduct was prohibited by the [FLSA]." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). The Supreme Court noted that "willful" is considered synonymous with "deliberate" and "intentional." *Id.* "Mere negligence on the part of the employer with regard to compliance with the FLSA is not sufficient to prove willfulness." *Gionfriddo v. Jason Zink, LLC*, 769 F.Supp.2d 880, 890 (D.Md. 2011); *see also Desmond v. PNGI Charles Town Gaming, LLC*, 630 F.3d 351, 358 (4th Cir. 2011) ("Negligent conduct is insufficient to show willfulness."). The employee bears the burden of proof when alleging a willful violation. *Desmond*, 630 F.3d at 358.

Butler contends that willfulness is a question of fact for the factfinder and the record contains sufficient evidence pertaining to Defendants' willfulness, including:

> the deposition testimony of its own management personnel, the declaration of its General Manager Walter Hanson, time records, pay stubs, and [Butler's] own testimony showing [Defendants'] undisputed policy requiring pre- and post-shift work, but prohibiting [Butler] from recording such integral and indispensable pre- and post-shift activities on [his] timesheets. Additionally, Mr. Butler testified that company officials directed him not to record all of the time worked, which meant [he was] only supposed to record the time worked from arriving on site at [his] first job until completing [his] last job of the day.

(ECF No. 268, at 17). Mr. Hanson declares that he was the General Manger for DirectSAT from 2005 until January 31, 2010,

14

overseeing approximately 110 technicians in Maryland and
Virginia. He states that "[d]uring the first couple of years of
my employment technicians were instructed not to record more
than 40 hours per week on their timesheets." (ECF No. 268-5 ¶
7). Mr. Hanson also stated that later, during a meeting with
Mr. Dan Yannantuano, DirectSAT's President, technicians were
told that it was permissible to exceed 40 hours per week as long
as they maintained a production rate of $15/hour or higher. He
asserts that one way to maintain this production rate was to
underreport time worked: "Technicians were trained they could
maintain a higher production rate by excluding time worked
before arriving at their first job and time worked after
completing their last job." (*Id.* ¶¶ 8-9). A better production
rate gave a technician a higher ranking, which translated to
higher pay per job, while technicians with lower production
rates were subject to discipline including termination. Mr.
Hanson declared that technicians were not paid for all time
worked, and regularly performed work before and after their
first and last job, including: preparing satellite dishes at
home; loading and unloading equipment; attending weekly
meetings; reading emails listing job assignments for the next
day; looking up directions and planning routes to complete
installations for the next work day; pre-calling customers; and
washing and maintaining their company vehicles. (*Id.* ¶¶ 10-11).

Butler testified that he was told separately by Mr. Hanson and Mr. Rob Green, another DirectSAT supervisor, that technicians could not record more than 40 hours per week. (ECF No. 268-3, at 30, 34, Trans. 113:4-24, 126:16 - 127:5). In a declaration, Butler states that during training and weekly meetings, DirectSAT directed him and other technicians not to record all the actual time spent working, but to record production time only, which consisted of their start time upon arrival at the first job and their end time after completing the last job of the day. Butler echoes Mr. Hanson's testimony concerning DirectSAT's practices of rewarding technicians with high production rates and punishing those with low rates, and encouraging technicians to underreport time to present better production rates. (ECF No. 268-11 ¶ 10). He also states that DirectSAT caused him to work off the clock by performing a variety of tasks before and after his official start and end times. Butler estimates that he worked off the clock an average of ten to twenty hours per week. (*Id.* ¶ 12). Butler has presented sufficient evidence to create a genuine dispute of fact that Defendants' alleged FLSA violations were willful.[7]

_____

[7] As further evidence of willfulness, Butler points to the testimony of Mr. Ken Hildibrand and Mr. Joseph Harley. Hildibrand and Harley, both DirectSAT supervisors, assumed their positions after Butler had left his technician position, with Mr. Hildibrand becoming a General Manager in December 2009, and Mr. Harley becoming a supervisor during the summer 2010. (ECF

16

### 2. Defendants' Knowledge of Butler's Overtime Work

"In order to be liable for overtime wages under the FLSA, an employer must have 'knowledge, either actual or constructive of [that] overtime work.'" *Bailey v. Cnty. of Georgetown*, 94 F.3d 152, 157 (4th Cir. 1996) (*quoting Davis v. Food Lion*, 792 F.2d 1274, 1276 (4th Cir. 1986). Thus, the burden is on Butler to show that Defendants had knowledge, either actual or constructive, that he was working unrecorded overtime hours. *Id.* Decisions from the Fourth Circuit and this court have held that evidence of *occasional* after-hours work is not sufficient to raise a genuine dispute of material fact that the employer was on notice of the employee's *consistent* overtime work for a *long period of time*. *See Bailey*, 94 F.3d at 157; *Pforr v. Food Lion Inc.*, 851 F.2d 106, 109 (4th Cir. 1988) (noting that it was inappropriate for the district court to infer knowledge of the employee's 1350 claimed overtime hours from evidence that supervisor knew employee worked a couple of times off-the-clock, absent some evidence of employer's pattern or practice of

---

No. 268-6, at 4, Trans. 7:20-21, 9:21-24; No. 268-7, at 7:1-12). Additionally, in an attempt to demonstrate Defendants' policy of starting and ending the work day at the technician's arrival at his first job and departure from his last job, Butler attaches a document titled "Paycheck Verification Procedure" that states the policy as Butler represents it. But this document is of little utility for Butler's claim, as it is dated October 7, 2011 - over two years after Butler stopped being a technician - and is signed and acknowledged by Mr. Lionel Murray, an opt-in Plaintiff. (ECF No. 269-2).

acquiescence to off-the-clock work); *Caseres v. S & R Mgmt. Co., LLC*, No. 12-cv-01358-AW, 2013 WL 4010894, at *5 (D.Md. Aug. 5, 2013) (noting that plaintiff's single conversation with co-worker and a supervisor's occasional observance of him working after the day's end were insufficient to create a genuine dispute that the employer was on notice of nearly three years of regular overtime work); *Darrikhuma v. Southland Corp.*, 975 F.Supp. 778, 784 n.10 (D.Md. 1997) ("Plaintiff alleges that a number of other individuals saw him work overtime. Because this assertion is unsupported and vague as to whether any of those persons knew that Plaintiff worked off-the-clock hours, it must also be rejected.").

The crux of Defendants' argument is that employees had an established method for reporting time worked and disputing any payroll issues, but Butler generally failed to follow those procedures and, when he did, the issue was promptly resolved in his favor. They point to the employee handbook which states that all overtime hours worked will be compensated in accordance with state and federal law provided it is authorized in advance by the employee's supervisor. (ECF No. 261, at 27; No. 262, at 13-14). The President of DirectSAT testified that "[w]e have a lot of overtime situations. We pay a lot of overtime." (ECF No. 257-11, at 17, Trans. 68:4-6). Defendants also point to the culture they established of encouraging complaints regarding

perceived wrongful practices, including:  telling employees that they should report unethical behavior to their supervisor, setting up a complaint procedure and a method for disputing job payments.  (*See* ECF No. 261, at 14, 16; ECF No. 262, at 15). Defendants state that Butler testified that he read the employee handbook (ECF No. 257-3, at 67, Trans. 101:5-10), which is corroborated by acknowledgement receipts signed by Butler.  (ECF Nos. 257-9 and 257-10).  Furthermore, Defendants draw attention to Butler's timesheets, which illustrate numerous instances when he reported, and was paid for, overtime.  (ECF Nos. 259 and 260).  He also testified that when he worked more than forty hours, he recorded those hours (ECF No. 257-3, at 77, Trans. 114:12-18); he stated that he performed some off-the-clock work on his own, and not at the behest of Defendants (*id.* at 89, Trans. 133:12-18).  He also testified that he could not recall ever calling the Human Resources Department to complain about not being paid properly.  (*Id.* at 82, Trans. 119:8 - 120:5).

Defendants rely principally on *White v. Baptist Memorial Health Care Corporation*, 699 F.3d 869 (6th Cir. 2012), for their argument that Butler's failure to follow DirectSAT's time reporting procedures prevented DirectSAT from learning about its alleged FLSA violations.  In *White*, the United States Court of Appeals for the Sixth Circuit, citing prior decisions from the Fifth, Eighth, and Ninth Circuits, held that "if an employer

establishes a reasonable process for an employee to report uncompensated work time the employer is not liable for non-payment if the employee fails to follow the established process," because the employee has prevented the employer "from knowing its obligation to compensate the employee and thwarts the employer's ability to comply with the FLSA." 699 F.3d at 876 (*citing Hertz v. Woodbury Cnty.*, 566 F.3d 775 (8th Cir. 2009); *Newton v. City of Henderson*, 47 F.3d 746 (5th Cir. 1995); *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413 (9th Cir. 1981)). The employer in *White* had a procedure for employees to claim compensation for interrupted meal breaks and other payroll errors. The evidence demonstrated that each time the plaintiff in *White* followed those procedures, she was compensated. Accordingly, the court in *White* held that the plaintiff could not be compensated for interrupted meal breaks that she never reported to her supervisors. The most she did was tell them that she was not getting her meal breaks, but she never told them that she was not being compensated for those missed breaks. *Id.*

Here, Defendants are making what is in essence an equitable estoppel argument: *i.e.*, Butler cannot assert claims for unpaid overtime because he did not previously report overtime work or dispute his pay using DirectSAT's internal procedures. But as Judge Motz recently noted:

> [n]either this court nor the Fourth Circuit
> . . . has held that an FLSA claimant may be
> estopped from pressing a claim to recover
> unpaid overtime compensation merely because
> the claimant did not comply with the
> employer's policies requiring regular
> reporting of overtime.    Rather an FLSA
> claimant seeking unpaid overtime wages needs
> only to establish that the employer had
> either actual or constructive knowledge that
> the employee was performing overtime work.
> *Bailey*, 94 F.3d at 157; *see also* 29 C.F.R. §
> 785.11.

*Smith v. ABC Training Ctr. of Md., Inc.*, No. JFM-13-306, 2013 WL 3984630, at *9 (D.Md. Aug. 1, 2013).   Judge Motz acknowledged that contrary requirements have been adopted by some circuits (citing *White*), but pointed to the fact that the Second Circuit has held otherwise.   *Id.* at *10 (*citing Holzapfel v. Town of Newburgh*, 145 F.3d 516, 524 (2$^d$ Cir. 1998) ("[O]nce an employer knows or has reason to know that an employee is working overtime, it cannot deny compensation even where the employee fails to claim overtime hours.")); *see also White v. Wash. Gas*, No. DKC 2003-3618, 2005 WL 544733, at *5 (D.Md. Mar. 4, 2005) (quoting *Holzapfel* for the same principle); *Reich v. Dep't of Conservation & Natural Res.*, 28 F.3d 1076, 1082 (11th Cir. 1994) (noting that "a court need only inquire whether the *circumstances* . . . were such that the employer either had knowledge [of overtime hours being worked] or else had the opportunity through reasonable diligence to acquire knowledge" (citation omitted; alternations and emphasis in original)).

Furthermore, even those courts that recognize an equitable estoppel defense have disavowed the employee's obligation to report overtime work when the employer had actual or constructive knowledge that the employee was working overtime. *Smith*, 2013 WL 3984630, at *10 (*citing Newton*, 47 F.3d at 748-49; *White*, 699 F.3d at 876-77). Consequently, "[t]o recover [his] unpaid overtime, [Butler] must prove that he worked overtime within the limitations period, [was] eligible to receive overtime compensation, [was] not compensated for the overtime that [he] worked, and that [Defendants] had actual or constructive knowledge that [he was] working overtime. [Butler] need not allege or establish compliance with [Defendants'] internal reporting requirements if [he] otherwise can prove that [Defendants] had knowledge of [his] overtime." *Id.* (internal citation omitted).

The evidence on the record creates a genuine dispute of material fact as to whether Defendants had actual or constructive knowledge of Butler's overtime work. Defendants had a practice of sending him work assignments before the start of his shift that he had to read and map out, along with requiring him to pre-call customers before arriving at his first assignment. Additionally, there was a company policy that technicians unload their vehicles at the end of the day and reload them at the start of the day. Butler and his supervisor

Mr. Hanson testified that management instructed technicians not to record more than forty hours per week and encouraged them to underreport their time to appear more productive. This is not a situation where the employer did not have policies requiring off-the-clock work and the employee did not report any overtime on his timesheets, thereby keeping the employer in the dark as to the employee's activities. *See Caseres*, 2013 WL 4010894, at *5; *White*, 2005 WL 544733, at *5; *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 177 (7th Cir. 2011) ("[T]he FLSA stops short of requiring the employer to pay for work it did not know about, and had no reason to know about.").[8]

### 3. Compensability of Butler's Off-the-Clock Work

Butler contends that he was required to perform numerous tasks off-the-clock for Defendants without compensation. Defendants argue that the tasks cited by Butler were not compensable as a matter of law and, therefore, he does not have a claim.

---

[8] Defendants also make much of Butler's testimony that his start and end times were accurate as evidence that he actually got paid for all time worked. (*See, e.g.*, ECF No. 257-3, at 55 and 63, Trans. 81:7-16, 92:4-5). When taking the evidence in the light most favorable to Butler, a reasonable interpretation of this testimony is that he was confirming that the times on his timesheet were accurate as to the start and end times *as dictated by Defendants*; *i.e.*, the arrival at the first job of the day and departure from the last job. What Butler is alleging is that Defendants' policy was wrongful: the start and end of his compensable time should have encompassed the work he performed before and after his first and last jobs of the day.

The FLSA provides that employers shall pay employees overtime for all hours worked in a week in excess of forty. 29 U.S.C. § 207.  This requirement is applicable unless the time at issue is "de minimis."  *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692 (1946).  "The term 'work' is not defined in the FLSA, and courts are left to determine the meaning of the term."  *Perez v. Mountaire Farms, Inc.*, 650 F.3d 350, 363 (4th Cir. 2011) (*citing IBP, Inc. v. Alvarez*, 546 U.S. 21, 25 (2005)).

The Portal-to-Portal Act, 29 U.S.C. §§ 251-62, amended the FLSA and relieves employers of the obligation to compensate an employee for:

> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and
>
> (2) activities which are preliminary to or postliminary to [the] principal activity or activities,
>
> which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.  For purposes of this subsection, the use of an employer's vehicle for travel by an employee and activities performed by an employee which are incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such vehicle for travel is within the normal commuting area

24

> for the employer's business or establishment
> and the use of the employer's vehicle is
> subject to an agreement on the part of the
> employer and the employee or representative
> of such employee.

29 U.S.C. § 254(a).  Preliminary and postliminary activities are compensable, however, if they are an "integral and indispensable part of the [employee's] principal activities." *Steiner v. Mitchell*, 350 U.S. 247, 256 (1956).  An "integral and indispensable" activity is itself a principal activity for purposes of the Portal-to-Portal Act. *IBP*, 546 U.S. at 37.  The Fourth Circuit has adopted the Ninth Circuit's formulation of the term, holding that an act is "integral and indispensable" to the employer's principal activity when it is:  "(1) necessary to the principal work performed; and (2) primarily benefit[s] the employer.  An act is necessary to a principal activity if that act is required by law, by company policy, or by the nature of the work performed." *Perez,* 650 F.3d at 366 (*citing Alvarez v. IBP, Inc.*, 339 F.3d 894, 902-03 (9th Cir. 2003)).

### a.  Reading Emails and Planning Routes to Job Assignments

Butler contends that he worked off-the-clock when he was required to read emails listing his work assignments for the day and, from those assignments, map out that day's route. (ECF No. 257-4 ¶ 12(d) and (e); ECF No. 257-5, at 10)).  Defendants argue that Butler's claim is precluded by the summary judgment ruling in *Espenscheid*, of which Butler was an opt-in plaintiff (*See* ECF

No. 257-24), or, in the alternative, persuasive legal authority counsels in favor of holding that these tasks are not compensable.

In *Espenscheid*, DirectSAT sought summary judgment on the issue of whether the time spent by technicians reading emails and mapping routes is barred by the Portal-to-Portal Act. The court relied on two cases and held that "[r]eceiving and mapping routes . . . are tasks inherently related to plaintiffs' commute and not related uniquely to the activities of installing and upgrading cable services. Every employee who must drive in order to reach his or her work site must perform the same tasks." *Espenscheid v. DirectSat USA, LLC*, No. 09-cv-625-bbc, 2011 WL 10069108, at *23 (W.D.Wis. Apr. 11, 2011) (*citing Rutti v. Lojack Corp.*, 596 F.3d 1046 (9th Cir. 2010); *Ahle v. Veracity Research Co.*, 738 F.Supp.2d 896 (D.Minn. 2010)). *Rutti* involved a technician who installed and repaired vehicle recovery systems in vehicles. Most, if not all, of the installations and repairs were done at the clients' locations. The plaintiff in *Rutti* was paid on an hourly basis starting when he arrived at his first job location and ending when he completed his final job of the day. He sought compensation for "off-the-clock" activities performed before he left for his first job, including time spent in the morning "receiving assignments for the day, mapping his routes to the assignments, and prioritizing the jobs. This

included time spent logging on to a handheld computer device
provided by [his employer] that informed him of his jobs for the
day." 596 F.3d at 1049. The Ninth Circuit held that these
activities were not "integral to his principal activities," as
they are related to his commute. *Id.* at 1057. Similarly, in
*Ahle*, the United States District Court for the District of
Minnesota found that the time spent by a private investigator
mapping directions to the subject of an investigation is not a
principal activity or an activity integral to principal
activities. 738 F.Supp.2d at 916 (*citing Rutti*, 590 F.3d at
1057).

Butler counters that "the facts and circumstances here, as
well as the legal arguments made, are more robust than those in
*Espenscheid* and require a different result." (ECF No. 268, at
24). Specifically, he states that he was required to login to
his computer, open work emails that detailed his assignments,
review those assignments to determine the type of job, necessary
equipment and anticipated length of such a job. Additionally,
Butler argues that unlike normal employees who travel to the
same worksite every day, DirectSAT technicians were required to
map out directions to their field assignments, which were always
changing.

Butler's arguments are unconvincing. He cites as support
his deposition testimony, where he testifies that he would

27

receive emails to his personal account the evening before the next workday.  He would print them off, prioritize the jobs, and determine whether or not he needed to go into the warehouse for equipment.  (*See* ECF No. 268-3, at 16-17, Trans. 54:3 - 61:7).  Butler's situation is very similar — if not identical — to the employees' situations in *Espenscheid*, *Rutti*, and *Ahle*.  Butler does not cite any cases that hold otherwise and, if anything, recent decisions have confirmed Defendants' position.  *See Chambers v. Sears Roebuck and Co.*, 428 F.App'x 400, 413 (5th Cir. 2011) (finding that time spent by a technician downloading assignments on home computer was incidental to technician's commute (*citing* H.R. Rep. No. 104-585, at 5 (1996) (noting that "communication between the employee and employer to receive assignments" was incident to the use of an employer's vehicle for commuting))); *Colella v. City of New York*, 986 F.Supp.2d 320 (S.D.N.Y. 2013) (time spent by employees of city's building maintenance division speaking with their supervisor about scheduling matters while commuting between their homes and work locations were incidental, preliminary, or postliminary to "exempt commute time").  Consequently, time spent by Butler reading emails regarding his next day's appointments, mapping out directions, and prioritizing his routes is not compensable under the FLSA.

**b.    Performing Vehicle Maintenance**

Butler seeks compensation for time spent maintaining his company vehicle. Defendants' vehicle policy provides that the employee is responsible for safe, overnight parking at his home, along with locking the vehicle and removing any tools and equipment at the end of the day. The policy further provides that the employee is responsible for the maintenance and cleanliness of the vehicle. (ECF No. 269-3). Butler testified that he washed his van once a week because he was instructed by the employee handbook and his supervisors that it had to be clean at all times. Butler noted that he washed it on one of his days off and it took him about an hour. (ECF No. 268-3, at 29, Trans. 107:12 - 108:10).

Defendants argue that, like in *Espenscheid*, this time is not compensable because it is incidental to the commute. The *Espenscheid* court held that "vehicle maintenance [is a] task inherently related to plaintiffs' commute and not related uniquely to the activities of installing and upgrading cable services. Every employee who must drive in order to reach his or her work site must perform the same tasks." 2011 WL 10069108, at *23 (*citing* 29 U.S.C. § 254(a)(1), (2) (neither "traveling to and from" work nor "activities . . . incidental to . . . commuting" are compensable under FLSA)).

29

Similar to his arguments concerning his receipt and mapping of driving routes, Butler argues that his factual circumstances and legal arguments are more robust and require a different result than previous cases.  Unlike a normal employee's commute, Butler states that as part of his commute he was "required to inspect his COV or 'roaming office' which included shelving, lock boxes, ladders and other items that were unique to his job as a technician.  Accordingly, such required work activities were integral and indispensable to [his] job and therefore not barred by the Portal-to-Portal Act."  (ECF No. 268, at 24).  Butler cites no case law to support his argument, and applicable authority falls firmly on the side of Defendants.  *See, e.g.*, *Chambers*, 428 F.App'x at 420 n.55 ("[R]efueling the service van, performing vehicle safety inspections, and tidying up the van . . . are [activities] clearly incidental to the commute under the [Portal-to-Portal Act] and thus non-compensable[.]"); *Smith v. Aztec Well Servicing Co.*, 462 F.3d 1274, 1291 (10th Cir. 2006) (noting that time spent changing a flat tire, pushing the vehicle out of the mud, or putting chains on tires are all activities necessary to arrive at work, "nothing more than what commuters would normally do if their vehicle encountered such exigencies," and are therefore preliminary to or postliminary to the plaintiff's principal activities); *Aiken v. City of Memphis*, 190 F.3d 753, 759 (6th Cir. 1999) ("Keeping vehicles clean and

30

scheduling maintenance to be done at the city's expense are hardly arduous and precisely the sort of activities that Congress had in mind when it used the phrase 'incidental to the use of [the employer's] vehicle.'" (alteration in original)); *Little v. Technical Specialty Prods., LLC*, 940 F.Supp.2d 460, 477 (E.D.Tex. 2013) ("Plaintiff's principal activity was installing and servicing video camera systems on oil rigs. Obtaining maintenance or repairs for his truck is a preliminary or postliminary activity."); *Espinoza v. Cnty. of Fresno*, No. 1:07-cv-01145-OWW-SMS, 2011 WL 3359632, at *8 (E.D.Cal. Aug. 3, 2011) ("The cleaning and maintenance Plaintiffs seek compensation for is related to Plaintiff's employment [law enforcement] only in the attenuated sense that such activities are necessary to safely operate any automobile."); *Ahle*, 738 F.Supp.2d at 916 ("Cleaning, maintenance, and fueling of Plaintiffs' vehicles before leaving for an investigation do not constitute principal activities or activities integral to principal activities that started the work day."). Butler cannot recover for the time he spent maintaining his vehicle.

### c. Attending Meetings

In his complaint, Butler alleges that he attended weekly meetings without pay. (ECF No. 1 ¶ 8). In his declaration, he states that he worked off-the-clock attending bi-weekly meetings at DirectSAT's office. (ECF No. 257-4 ¶ 12(d)). He later

31

testified that when he worked at D.C. South (the only time period that could possibly fall within the FLSA's statute of limitations), there were meetings two to three times a month. (ECF No. 268-3, at 19, Trans. 68:5-9).  Butler testified that each meeting lasted anywhere from fifteen to thirty (15-30) minutes.  (*Id.*, at 30, Trans. 111:6-9).  Confusingly, Butler testified that on days when he attended a meeting, he would arrive at the warehouse at 7:00 am and would record that arrival in his time sheet.  (*Id.* at 19, 30, Trans. 69:9-13, 111:14-16). Later he acknowledged that he would record the time he spent at meetings.  Confused, Defendants' counsel asked:  "You just mean there was no additional, like, piece rate for that?"  Butler responded:  "Right.  We didn't get paid for being there." Defendants' counsel then asked that if the time was recorded, would Butler have been paid for that time, even if it pushed him over forty hours for the week.  Butler responded that he did not know.  (*Id.* at 36-37, Trans. 137:10 - 138:1).

Defendants do not contend that time spent in meetings is not a primary activity of a technician, or that it is not integral and indispensable to a primary activity, or that the work was for a *de minimis* amount of time.  Rather, they argue that Butler testified that he recorded the time he spent in those meetings, which indicates that he was compensated for that time and has no FLSA claim.  Butler's testimony, however,

32

concerning whether and how he was paid for time spent in meetings, combined with the declaration of his supervisor Mr. Hanson, who stated that technicians regularly performed work before going on-the-clock, including attending weekly meetings at DirectSAT's offices, creates a genuine dispute of material fact as to whether Butler was compensated for the time he spent in meetings.

### d.   Attending Training

Defendants next contend that Butler cannot recover for time he spent training.  They argue that Butler testified that he was paid an hourly rate during his training period and that he recorded his time correctly and accurately.  Thus, they maintain that he admitted there was no issue with his compensation during this time period.

As an initial matter, nowhere in Butler's complaint is the word "training" used.  In addition, Butler's declaration and answers to interrogatories do not state that he is seeking unpaid wages for time spent training.  Finally, no mention of training is raised in Butler's opposition to Defendants' motion for summary judgment.  While some of the opt-in Plaintiffs testified that they are seeking to recover allegedly unpaid overtime from weeks they spent training, Butler, the named Plaintiff in this suit, is not seeking and has not presented evidence in support of a claim for uncompensated training time.

*Cf. Koelker v. Mayor & City Council of Cumberland (Md.),* 599 F.Supp.2d 624, 629 (D.Md. 2009) (noting that plaintiffs could not amend their complaint at the summary judgment stage to add claims that were "factually distinct" from their other FLSA claims because the new claims were not the subject of discovery).   Accordingly, the collective cannot recover for uncompensated training time.   *Cf. In re Family Dollar FLSA Litig.,* 637 F.3d 508, 519 (4th Cir. 2011) (noting that a named plaintiff whose claim had been dismissed on the merits at the summary judgment stage could not represent other opt-in plaintiffs regarding such a claim).   For tasks that are compensable, however, the fact that they were done during training does not bar Plaintiffs' recovery.[9]

### e.   Building Satellite Dishes at Home

Butler is seeking compensation for time spent building satellite dishes at home.   When asked how often he built satellite dishes, Butler testified that he did so on about fifty percent of the nights per week.   Butler stated that he was not directed to do this, but that it was encouraged: his supervisors told him that to increase his efficiency, building satellite dishes the night before appointments would help greatly.   It took him "minutes" to build a single dish.   The most assembled

---

[9]   For example, time spent pre-calling customers during a training week could be compensable.

dishes he could fit in his company vehicle was five.   He estimated that to build five would take about thirty minutes. (ECF No. 268-3, at 35-36, Trans. 130:12-15, 133:12-18, 136:3 - 137:9).

Defendants do not argue that building satellite dishes is not integral or indispensable to Butler's principal activity. Rather, Defendants argue that summary judgment should be granted because no one directed Butler to build dishes at home and, therefore, he cannot prove that Defendants had the knowledge necessary to establish an FLSA violation.

Defendants' argument will be rejected.   While there is no explicit policy requiring technicians to build satellite dishes at home, Butler testified that a more efficient technician would have a higher "score," and a higher score kept the technician out of trouble with his supervisors.   He also testified that his supervisor told him that building satellite dishes before going out in the field (and "on-the-clock") was a good way to increase efficiency.   *See Crawford v. Lexington-Fayette Urban Cnty. Gov't*, No. 06-299-JBC, 2008 WL 2885230, at *7 n.6 (E.D.Ky. July 22, 2008) ("A fact finder may conclude that while the plaintiffs are not required to perform such tasks, there may be an expectation or unwritten policy that such work be performed." (*citing Hill v. Muscogee Cnty. School Dist.*, No. 4:03-CV-60

(CDL), 2005 WL 3526669, at *3 (M.D.Ga. Dec. 20, 2005)).
Summary judgment as to this task will be denied.

### f.  Loading and Unloading the Vehicle

Butler seeks compensation for time spent off-the-clock
loading and unloading equipment from his company vehicle.  At
his deposition, he testified that he was required to load and
unload only two items from his vehicle each night: a "bird dog"
and an inclinometer.  The rest of his equipment stayed in the
van overnight.  (ECF No. 268-3, at 36, Trans. 134:2-18).  He
would bring the "bird dog" and inclinometer inside his home to
charge them.  He testified that the employee handbook told
technicians to take everything out of the van each night, which
he understood to mean those two items.  He would take the two
items in and out of the vehicle every day.  The "bird dog" was
approximately eight by six inches and weighed less than a pound
and the inclinometer was about as big as a cell phone and
weighed less than a pound.  He testified that he did not make an
extra trip to take them to his vehicle in the morning; instead,
he would just stick them in his tool bag.  (*Id.* at 28, Trans.
102:24 - 105:12).

Defendants primarily argue that this work is not
compensable because the time spent carrying small items between
one's home and vehicle constitutes a *de minimis* amount of time.
For reasons discussed below, it is not appropriate, when

considering whether an activity is *de minimis*, to analyze each activity separately. Consequently, because Butler alleged that he performed multiple tasks before work started each morning that were not compensated, the entirety of that work should be considered when determining whether Butler's work effort was *de minimis*.

Butler's effort to seek compensation for this task fails for a reason other than it being *de minimis*, however. There is no indication that he spent any more time loading and unloading equipment than would have been spent walking to and from his vehicle. Because walking between one's home and vehicle is part of an employee's commute, and thus noncompensable, the time spent carrying an item as part of that commute is noncompensable. *See Chambers*, 428 F.App'x at 418 ("[O]ne cannot segregate time spent walking to and from the van in the morning and evening with [the small tool] from merely commuting, which is non-compensable."); *Donatti v. Charter Commc'ns, LLC*, 950 F.Supp.2d 1038, 1053 (W.D.Mo. 2013) (noting that cable technicians' task of carrying a handful of small items between their home and vehicle was noncompensable because it "does not lengthen the time otherwise required for a technician to walk to and from the vehicle").

g.  **Performing Activities That Defendants Contend Are**
    ***De   Minimis***

Butler is seeking compensation for time spent each morning: "pre-calling" customers before going out in the field and completing paperwork, both done while off-the-clock.  Defendants do not contend that these tasks are not integral and indispensable to a technician's principal activity.  Instead, they argue that this work is *de minimis* and therefore not compensable.

"[T]he *de minimis* rule precludes employees from recovering for compensable work '[w]hen the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours.'  According to the Court, compensation for '[s]plit-second absurdities' is not justified by the policy of the FLSA." *Perez*, 650 F.3d at 372 (*quoting Anderson*, 328 U.S. at 692) (second and third alterations in original) (internal citation omitted).

Defendants present separate *de minimis* arguments for each of the tasks recounted above.  For example, they contend that because Butler testified to making only one pre-call before arriving at his first job, and that each call only took a matter of seconds, the task of pre-calling customers takes a *de minimis* amount of time and, therefore, is not compensable.

Defendants' argument depends on each task being evaluated separately but, as Plaintiff Butler points out, the *Espenscheid* court was presented with a similar argument and rejected it, determining that "in applying the *de minimis* standard, the tasks must be evaluated in the aggregate, not separately for each discrete activity." 2011 WL 10069108, at *24. Even more relevant to this case is the Fourth Circuit's decision in *Perez*. Faced with a similar proposition to that presented by Defendants, the Fourth Circuit squarely rejected it, noting that:

> [i]n applying the *de minimis* rule, we consider the aggregate amount of time for which the employees are otherwise legally entitled to compensation. *See* DOL Wage & Adv. Mem. No. 2006-2 n.1 (May 31, 2006). We do not, as [defendant] suggests, evaluate each task or group of tasks separately to determine if the time period is *de minimis*. Adopting [defendant's] approach would undermine the purpose of the FLSA by allowing employers to parcel work into small groups of tasks that, when viewed separately, always would be considered *de minimis*.

*Perez*, 650 F.3d at 373. Defendants cite several cases where courts found each task *de minimis*, but those cases involved situations where that task was the *only* task potentially eligible for compensation, as opposed to the situation here, where multiple tasks are at issue. *See Chambers*, 428 F.App'x at 418 (finding that logging into the computer, carrying it to the

van, plugging it into the van, and carrying it back and plugging it in at home is incidental to the commute, but even if integral and indispensable, would not take more than a "minute or so" to complete); *Rutti*, 596 F.3d at 1057-58 (finding that preliminary activities consisted of tasks related to his commute — which were noncompensable — and paperwork that did not take more than a minute or so to complete); *Singh v. City of New York*, 524 F.3d 361, 371 (2[d] Cir. 2008) (finding that the added commuting time spent by an inspector carrying inspection documents was "give or take" ten minutes and therefore *de minimis*).

Consequently, when determining whether work done off-the-clock is *de minimis*, the court is to consider the aggregate time spent allegedly working off-the-clock that is compensable under the FLSA.  Here, those tasks are pre-calling customers and filling out paperwork, along with building satellite dishes and attending meetings.  When conducting a *de minimis* analysis three factors are to be considered: "(1) the practical difficulty the employer would encounter in recording the additional time; (2) the total amount of compensable time; and (3) the regularity of the additional work."  *Perez*, 650 F.3d at 373.  This analysis "necessarily requires a factual inquiry that will change on a case-by-case basis."  *Id.* at 373-74.

The details of Butler's efforts building satellite dishes and attending meetings are recounted above.  In regard to pre-

calling customers, Defendants' policy required technicians to call their customers at the beginning of the day to acknowledge their appointment and give them an estimated time of arrival. Failure to do so would result in discipline. (ECF No. 269-6). Butler testified that he would pre-call all his morning customers, which varied between one and seven customers. The content of the call varied, but would typically consist of confirming with the customer the appointment and the work order. Each individual call would last a couple of seconds. He later testified that he pre-called only his first customer from home, and then called the second customer once he arrived at the first house, the third customer from the second house, and so on. (ECF No. 268-3, at 17-19, Trans. 61:18 — 66:10). Defendants argue that Butler's testimony indicates that he only made one call off-the-clock; all subsequent calls were made after he arrived at his first job site and his start time had begun, such that he was on-the-clock.

In regard to paperwork, Butler alleges in his complaint that he completed paperwork regarding finished work orders. (ECF No. 1 ¶ 8). Butler testified that at home he would put together his paperwork for that day's work. Sometimes this was done before dinner, sometimes after. There was no requirement to do it at a certain time. The paperwork was the company's documentation of the jobs completed, *i.e.*, the "pink copies."

41

He would gather the papers, staple them, and file them with Defendants the next time he was at the warehouse. This took less than a minute. (ECF No. 268-3, at 22-23, Trans. 81:24 - 83:17).

The first factor in the *de minimis* analysis is the practical difficulty the employer would encounter in recounting the additional time. Certainly, as to building satellite dishes, pre-calling, and paperwork, it would be difficult to recount given that this work was performed off-site and Butler has merely provided time estimates. "Although it may be difficult to determine the actual time a technician takes . . ., it may be possible to reasonably determine or estimate the average time." *Rutti*, 596 F.3d at 1059. The time Butler spent in meetings should be simpler to recount as the meetings happened at the warehouse and such time may be reflected in the time sheets.

The second factor in the *de minimis* analysis is the total amount of compensable time. Butler contends that he worked six days a week (ECF No. 257-4 ¶ 4), and DirectSAT required that: each day he pre-called at least one customer and did paperwork, which took no more than a couple of minutes; approximately half of these days he built satellite dishes after work, which took at most thirty minutes per day; and twice a month attended meetings that lasted a total of one hour. Making this

42

calculation in the light most favorable to Butler, in a given week he worked at most approximately 125 minutes (2.08 hours) for which he was uncompensated, or just more than twenty minutes of off-the-clock work per day.[10]   Many courts have set a "ten-minute rule": compensable activities are rendered noncompensable when those activities do not exceed a total of ten minutes per day.   The Fourth Circuit, however, has flatly rejected such a hard-and-fast rule.  *Perez*, 650 F.3d at 373.  In *Perez*, it found that employees who worked 10.204 minutes of uncompensated work per day was not *de minimis* because over the course of a year that amounts to a full week's wages.  *Id.* at 374.  Here, taking the evidence in the light most favorable to Butler, there is a genuine dispute as to whether the uncompensated time he worked is *de minimis*.  *See Rutti*, 596 F.3d at 1059 (noting that over an hour a week of uncompensated time is "a significant amount of time and money").

Finally, the third factor of the *de minimis* analysis examines the regularity of the additional work.   Butler completed paperwork and pre-called customers every day.   He built satellite dishes approximately every other day, and

---

[10]  The calculation breaks down into:   15 minutes per week for meetings (a 30 minute meeting that occurred twice a month) + 90 minutes per week for building satellite dishes (30 minutes per day x 3 days (every other day in a six-day workweek)) + 20 minutes per week for paperwork and pre-calling customers = 125 minutes per week.

attended meetings approximately twice per month.  While these activities were not as regular as those in a "donning and doffing" case, where the employee is required to put on protective gear each day before going to the workspace, they are sufficiently regular to survive summary judgment. In sum, Butler can proceed on his claim that the time he spent pre-calling customers, doing paperwork, building satellite dishes, and attending meetings was not properly compensated under the FLSA.

### h.   Commuting to the Initial Job Site and from the Final Job Site of the Day

Butler seeks compensation for the time he spent driving from his home to his first job of the day, and from his last job of the day to his home.  Normally, travel from home to work is not compensable regardless of whether the employee works at a fixed location or at different job sites.  29 U.S.C. § 254(a); 29 C.F.R. § 785.35.  Butler, however, seeks to proceed under the "continuous workday" doctrine, where "the compensable workday begins with the first principal activity of a job and ends with the employee's last principal activity." *Perez*, 650 F.3d at 363; *see also* 29 C.F.R. § 790.6(a).  For example, in *IBP*, the Supreme Court held that the time slaughterhouse employees spent before and after their shifts walking from the locker room — where they engaged in the principal activities of donning and doffing their protective gear — to the slaughterhouse floor and

back was part of the continuous workday and therefore compensable under the FLSA.  546 U.S. at 37.

Butler contends that pre-calling his customers and loading and unloading tools from his vehicle were indispensable and integral to a technician's principal activities and therefore constitute the start and end of the continuous workday.  Because time spent driving to the first job and from the last job of the day occurred between pre-calling customers and loading and unloading, Butler contends that it is part of the workday for which he should be compensated.  (ECF No. 268, at 25).  As discussed above, however, Butler has not demonstrated that loading and unloading his company vehicle is an independent task separable from his commute and thus, that it is compensable.  Consequently, he is not eligible for compensation for the time spent driving between his last job and his home at the end of the day.

The only task remaining that Butler asserts is performed before driving to his first job is pre-calling customers.  Defendants do not contend that this task is not a principal activity or integral to a principal activity.  Instead, Defendants argue that Butler's "continuous workday" theory does not convert Butler's standard commuting time into compensable time, because "there was *no requirement* that he perform certain tasks or activities immediately before or after his commute."

45

(ECF No. 257, at 40) (emphasis in original).  Courts have held that where the employee engages in a primary activity at home before his workday, his workday does not extend to the start of that primary activity, including travel time to his job site, if the employee is given a large period of time to complete that activity.  For example, in *Rutti*, the Ninth Circuit found that, even assuming that the employee's requirement to upload information on completed jobs constituted a primary activity for which he was entitled to compensation, the fact that the employee could perform this task at any time between 7:00 pm and 7:00 am, precluded extending his workday to whenever he completed the transmission.  In so holding, the court drew upon 29 C.F.R. § 785.16(a), which provides, in the context of waiting time, that "[p]eriods during which an employee is completely relieved from duty and which are long enough to enable him to use the time effectively for his own purposes are not hours worked."  Similarly, in *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 360-61 (2[d] Cir. 2011), the Second Circuit found that a retail specialist working in the field could not count his travel time as compensable because, even acknowledging that he performed required tasks at home, the record indicated that:

> it might have been necessary to perform certain activities in the morning, or in the evening.  It does not indicate that Kuebel was required to perform them immediately before leaving home, or immediately after

> returning home.   Indeed, there is nothing in
> the record to suggest that a Retail
> Specialist could not, for example, wake up
> early, check his email, synch his PDA, print
> a sales report, and then go to the gym, or
> take his kids to school, before driving to
> his first Home Depot store of the day.

*See also Bettger v. Crossmark, Inc.*, No. 1:13-CV-2030, 2014 WL 2738536, at *6 (M.D.Pa. June 17, 2014) (noting that plaintiff "has failed to present any evidence that Crossmark required her to check e-mail, load her car, or perform other administrative tasks *immediately* prior to driving to her first retail location." (emphasis in original)); *Bowman v. Crossmark, Inc.*, No. 3:09-CV-16, 2012 WL 2597875, at *8 (E.D.Tenn. July 5, 2012) (articulating the same principles); *Ahle*, 738 F.Supp.2d at 917 ("[T]he undisputed evidence is that Plaintiffs were not required to perform the activities claimed to be principal activities or integral to principal activities immediately prior to leaving for an investigation or immediately after returning home from an investigation."). The *Espenscheid* court articulated the same rule, ultimately finding that the plaintiffs — who had moved for summary judgment — had "not established that [they] performed their nonproductive tasks immediately before and after their commutes," but permitting them to do so at trial. 2011 WL 10069108, at *24 (emphasis added). Such a rule makes sense in the current age where employees often have smart phones and remote access to workstations. For example, an employee, before

47

leaving the office at 5:00 pm, is told by his boss that he wants a draft of the report emailed to him sometime before 11:00 pm that night.  The employee sits down to the complete the report between 10:00 pm and 11:00 pm.  This work is certainly a principal activity for which the employee is entitled to compensation for one hour.  It would be a perversion of the continuous workday doctrine, however, to deem the entire period — from leaving the office at 5:00 pm to reengaging at 10:00 pm — as compensable as part of the continuous workday.

In this case, Defendants' cell phone policy required technicians to call their customers at the beginning of the day to acknowledge their appointments.  By 8:30 am, technicians were supposed to have called each customer on that day's route to introduce themselves.  (ECF No. 269-6).  Butler testified that he pre-called "[f]irst thing in the morning starting about 7." Prior to leaving home each morning, he only called his first customer; the remaining customers he called from the field, starting with the second customer once he arrived at the first site, the third customer when he arrived at the second site, and so on.  The call Butler placed to his first customer from home took him "seconds" to complete.  (ECF No. 268-3, at 18-19, Trans. 62:1 - 66:10).  Defendants' policy also required a technician to be at his first job of the day by 8:00 am.

As discussed above, pre-calling customers could be an act indispensable and integral to Butler's principal activity. The first issue is whether Plaintiff *was required* to pre-call *immediately before* going out on the road. The evidence on both sides is scant, but taking it in the light most favorable to Butler, there is a genuine dispute over this issue. Butler had to be at his first job by 8:00 am. There is no testimony as to how long it took him to drive to his first job of the day. A reasonable factfinder could find that to make the call before he left and still arrive on time for his first job, Butler would have to call immediately before leaving or, alternatively, call close enough to his departure, such that he did not effectively have any time before he departed to use for his own purposes.

The next consideration is the amount of time Butler expended on this principal activity. He testified that it only took him seconds to pre-call customers before he left home for the day. This small amount of time is *de minimis*. Accordingly, the next question is whether a principal activity that is *de minimis*, done immediately before pre-shift travel, could nevertheless trigger the "continuous workday" rule such that the technician's travel time to his first job becomes compensable. The answer to this inquiry turns on whether deeming an activity *de mimimis* affects only the employer's liability to pay for that work and not the characterization of the activity (*i.e.*, it is

"work" that would otherwise be compensable but it is too trifling to make the employer pay for it) or, rather, whether a *de minimis* activity is not work, such that it cannot count as the first principal activity that begins the "continuous workday." In a concurring opinion, Judge Boudin, in a case that was later consolidated with *IBP* at the Supreme Court, observed:

> One further basis for resisting the Secretary [of Labor] derives from yet another principle from the Supreme Court, namely, that under certain circumstances time spent on a *de minimis* activity that is not the main activity of the worker should be disregarded. *See Mt. Clemens*, 328 U.S. at 692-93. If the time spent donning and doffing is *de minimis*, can it also not be disregarded as starting the workday and allow courts to disregard the associated walking and waiting? Such a result is not on its face at odds with *Steiner* where the donning and doffing and showering were not claimed to be *de minimis*.
>
> The Secretary replies that the *de minimis* concept has nothing to do with when the workday begins or ends but the *de minimis* concept is much fuzzier than the Secretary lets on: in the Supreme Court case that spawned it, the Court stated broadly that "compensable working time is involved" only "when an employee is required to give up a substantial measure of his time and effort." *Mt. Clemens*, 328 U.S. at 692. So one *could* say that a *de minimis* activity which is non-compensable time under *Mt. Clemens* does not start [] the workday, at least when preliminary to arrival "on the factory floor."
>
> Thus, two positions are juxtaposed. One is the Secretary's mechanical combination of *Steiner* with a rigid "everything after is

work" principle. The other is to treat required donning and doffing as compensable where more than *de minimis* but, where it is not, leaving both it *and* any associated walking and waiting time as non-compensable. Neither outcome is impossible analytically and neither is clearly dictated by Supreme Court precedent or underlying policy.

*Tum v. Barber Foods, Inc.*, 360 F.3d 274, 285-86 (1st Cir. 2004) (Boudin, J., concurring) (emphasis in original). While plaintiff in *Tum* sought *certoriari* on this question, the Supreme Court declined. 543 U.S. 1144 (2005).

The Fourth Circuit, albeit only in passing, appears to come out on the side that views the *de minimis* doctrine as a mere exception to liability which does not change whether the activity is "work." In *Perez*, it treated the *de minimis* issue as one to determine whether the work is noncompensable, "notwithstanding our holding that these activities are part of the continuous workday as acts 'integral and indispensable.'" 650 F.3d at 372. Similarly, the Supreme Court appears to agree with this view. In *Barber*, the case consolidated with *IBP*, the jury after trial in the district court found that the time spent donning and doffing protective gear was *de minimis* and thus not compensable. On appeal, the employees argued that the time spent waiting to doff their gear at the end of the shift was nevertheless compensable. The First Circuit rejected this argument, finding that the waiting time qualified as a

"preliminary or postliminary activity" and thus excluded by the Portal-to-Portal Act.   The Supreme Court held that the First Circuit was incorrect because doffing gear that is "integral and indispensable" to employees' work is a "principal activity," and thus the continuous workday rule mandates that time spent waiting to doff is not affected by the Portal-to-Portal Act and is instead covered by the FLSA.   546 U.S. at 36-40.   The Court held that doffing protective gear was a "principal activity" in spite of the fact that the jury found that the time spent doffing was *de minimis*.   While the Supreme Court was silent as to this additional wrinkle, its silence suggests that work that is *de minimis* only means the activity is noncompensable, not that it is further precluded from being considered a principal activity.

The statute and regulations support the view that has only been tangentially addressed by the Supreme Court and the Fourth Circuit.   The Portal-to-Portal Act exempts an employer from compensating an employee for travel to the place of his first principal activity, and for activities which are preliminary to or postliminary to said principal activity.   Preliminary and postliminary activities are those which occur prior to the time on any particular "workday" when the employee commences such principal activity, and the time period following completion of such an activity.   29 U.S.C. § 254(a).   29 C.F.R. 790.6(b)

provides that "workday" as used in the Portal Act means "the period between the commencement and completing on the same workday of an employee's principal activity or activities." Consequently, the language of the statute and regulation, bolstered by Supreme Court and Fourth Circuit precedent, leads to the conclusion that a *de minimis* activity can still constitute a principal activity that triggers the start of the continuous workday.[11]

The few courts to grapple directly with this issue have found in favor of the employer, however.  In *Rutti*, the Ninth Circuit ruled that the technician was not entitled to extend the start of his workday to when he checked his email, mapped routes, and filled out paperwork (and thereby include his travel time to his first job) because they "are either not principal activities or are *de minimis*."  596 F.3d at 1060.  Similarly, in *Singh*, then-Circuit Judge Sotomayor wrote that "the law of this circuit . . . is that a *de minimis* principal activity does not trigger the continuous workday rule," and she did not read the Supreme Court's decision in *IBP* as casting doubt on that

---

[11] It is necessary to emphasize the limits of this decision going forward because, as observed above, as technology advances and employees are always available for work, the principles embodied in the FLSA and its associated doctrine could be stretched beyond their intended bounds.  It is not hard to imagine "the 'continuous workday' rule [becoming] a 'continuous pay' rule."  *Lemmon v. City of San Leandro*, 538 F.Supp.2d 1200, 1209 (N.D.Cal. 2007).

position.   524 F.3d at 371 n.8; *see also Chambers*, 428 F.App'x
at   422   ("Because   the   Court   has   concluded   that   Sears'
technicians'   pre-commute   morning   activities   and   post-commute
evening   activities   under   the   [company's   Home   Dispatch   Program]
are   non-compensable   as   incidental   to   the   commute   and/or   *de
minimis*,"   the   continuous   workday   doctrine   does   not   extend   FLSA
coverage).    But   the   Ninth   Circuit   in   *Rutti*   seems   confused   about
the   effect   of   declaring   work   *de   minimis*:   while   it   ultimately
rules   that   a   *de   minimis*   activity   does   not   start   the   continuous
workday,   earlier   in   the   opinion   it   suggests   that   an   activity
that   is   *de   minimis*   only   affects   whether   the   employer   has   to   pay
for   that   activity,   not   whether   it   is   work   or   not.    *See*   596   F.3d
at   1057   ("Thus,   in   determining   whether   an   *otherwise   compensable
activity*   is   *de   minimis*,   we   apply   the   three-prong   test   set   forth
in   *Lindow*."   (emphasis   added)).    And   for   the   reasons   discussed
above,   the   view   of   the   import   of   *IBP*'s   is   different   than   that
taken   by   the   Second   Circuit.

Therefore,   Butler's   pre-calling   activity,   if   ultimately
proved   to   be   a   principal   activity   (or   integral   and   indispensable
to   a   principal   activity)   but   *de   minimis*,   could   trigger   the
continuous   workday   rule   but   only   if   he   can   further   prove   that
Defendants   required   him   to   pre-call   immediately   before   leaving
for   his   first   job,   or   so   close   in   time   to   leaving   his   home   that

he was unable "to use the time effectively for his own purposes." 29 C.F.R. § 785.16(a).

### 4.   State Law Claims

Butler also brought claims on behalf of himself and all technicians employed by Defendants in Maryland for violations of the Maryland Wage and Hour Law.  It appears that Butler no longer desires to represent a class on this claim, as he failed to move for class certification by the deadline.  In the instant motion, Defendants argue that because MWHL claims are analyzed the same as FLSA claims, Butler's individual MWHL claim must also fail.

Generally, "[t]he requirements under the MWHL mirror those of the federal law; as such, [Butler's] claim under the MWHL stands or falls on the success of [his] claim under the FLSA." *Turner v. Human Genome Sci., Inc.*, 292 F.Supp.2d 738, 744 (D.Md. 2003).  Butler does not respond to Defendants' arguments.  As discussed above, there are aspects of Butler's FLSA claim that survive summary judgment, therefore, those same aspects of his individual MWHL claim also survive.  It should be noted, however, that even if he is successful in showing Defendants' liability under both the FLSA and MWHL, he would only be able to recover once for damages resulting from Defendants' failure to pay wages as required by law.  *Clancy v. Skyline Grill, LLC*, No. ELH-12-1598, 2012 WL 5409733, at *5 (D.Md. Nov. 5, 2012) (*citing*

*Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 333 (1980)).

The complaint also included a similar claim on behalf of Butler and a class of technicians currently or formerly employed by Defendants in the District of Columbia for violations of District of Columbia Minimum Wage Law ("DCMWL").  Like the FLSA, the DCMWL provides explicitly for opt-in, collective actions. *See* D.C. Code § 32-1012(b) ("No employee shall be a party plaintiff to any action brought under [the DCMWL] unless the employee gives written consent to become a party.").  Butler never moved to certify a DCMWL collective; his motion for certification was expressly limited to the FLSA, as demonstrated by its title: "Plaintiffs' Motion and Memorandum to Conditionally Certify a Collective Action and Facilitate Notice Pursuant to 29 U.S.C. § 216(b)."  (ECF No. 41).  Based on that motion, the court conditionally certified a collective only as to the FLSA claim.  *See Butler*, 876 F.Supp.2d at 574.

Defendants argue that Butler never filed an opt-in consent form to assert a claim under the DCMWL.  Defendants do not cite any authority holding that the applicable statutes, requiring all plaintiffs (even named plaintiffs) to file an opt-in form, apply to DCMWL collective actions.  It is not necessary to examine this issue, however, because the DCMWL only protects those "employed in the District of Columbia," which occurs when:

"(1) [t]he person regularly spends more than 50% of their working time in the District of Columbia; or (2) [t]he person's employment is based in the District of Columbia and the person regularly spends a substantial amount of their working time in the District of Columbia and not more than 50% of their working time in any particular state." D.C. Code § 32-1003(b). Defendants contend that Butler has presented no evidence that he spent more than 50% of his work time within D.C.  They further state that Butler was based out of warehouses in Maryland.  In his opposition, Butler makes no attempt to respond to these arguments.  Finding no evidence on the record to raise a dispute that Butler spent more than 50% of his work time in D.C., summary judgment is granted to Defendants on the DCMWL claim.

## III. Motions to Seal

Defendants and Plaintiff Butler have each filed unopposed motions to seal selected exhibits that accompanied Defendants' motion for summary judgment and Butler's opposition.  Defendants seek to seal Exhibits 4-6, 10-11, 15, and 18 to their motion for summary judgment.  These exhibits include a full copy of DirectSAT's Employee Policy Manual (ECF No. 262); a full copy of DirectSAT's Employee Handbook (ECF No. 261); a copy of Defendants' rate sheet signed by Butler (ECF No. 263); a copy of Butler's earning statements (ECF No. 260); Butler's personnel

documents (ECF Nos. 258 and 264); and Butler's timesheets (ECF No. 259).

Butler seeks to seal Exhibits H - J and L - Q to his opposition to the motion for summary judgment (ECF Nos. 269 to 269-8). These exhibits include: a signed acknowledgment by opt-in Plaintiff Murray of Defendants' paycheck verification procedures (ECF No. 269-2); Defendants' vehicle policy (ECF No. 269-3); a corrective action form prepared for opt-in Plaintiff Murray (ECF No. 269-4); a completed "Truck Kit/Tool Issuance Form" for opt-in Plaintiff Poindexter (ECF Nos. 269-5); a signed acknowledgement by opt-in Plaintiff Poindexter of Defendants' Technician Cell Phone Policy (ECF No. 269-6); Defendants' timekeeping policy (ECF No. 269-7); Defendants' employee behavior policy (ECF No. 269-8); Butler's timesheets (ECF No. 269-1); and Butler's earnings statements (ECF No. 269).

Defendants submit that the exhibits related to their motion for summary judgment should be sealed as they were deemed confidential pursuant to the court-approved Confidentiality Stipulation (ECF Nos. 37 and 38) because they contain confidential and proprietary business information. The full copies of Defendants' employee handbook and the policy manuals will remain under seal. While Butler cites to their contents as evidence of Defendants' allegedly unlawful policies, he submits the relevant portions of those documents with his opposition and

testifies to any relevant portions.  Consequently, the full copies submitted by Defendants can remain under seal.  The copy of Defendants' rate sheet will also remain under seal.  (ECF No. 263).  The information contained in it — the rates paid for different jobs performed — is not relevant to the disposition of this motion and is confidential information that can remain under seal.  *See Pittston Co. v. United States*, 368 F.3d 385, 406 (4th Cir. 2004).

Butler's personnel documents, however, were necessary evidence for computing the statute of limitations on Butler's FLSA claim.  (ECF Nos. 258 and 264).  They consist of a checklist for technicians leaving the company and, a change of position form showing when Butler left his technician position to become a warehouse manager.  Defendants rely on these forms to support their statute of limitations defense to illustrate when Butler stopped working as a technician and when he was terminated by Defendants.  Consequently, Defendants will have fourteen (14) days to file a renewed motion to seal with redactions to Exhibits 4 and 18, or explaining why those documents must be sealed in their entirety.

Next, Defendants seek to seal in their entirety Butler's timesheets and earnings statements.  (ECF Nos. 259 and 260).  Defendants contend that these documents contain personal information that should be kept confidential, such as the

Butler's social security number, employee identification number, and/or home address.  The presence of this information alone is insufficient to justify sealing these documents in their entirety.  It is not apparent why these documents cannot be filed in redacted form in accordance with Fed.R.Civ.P. 5.2(a). In addition, Butler's home address is listed on the complaint, which has never been filed under seal.  Consequently, Defendants will have fourteen (14) days to file a renewed motion to seal with redactions to Exhibits 5 and 6, or explain why those documents must be sealed in their entirety.

Butler, on the other hand, does not attempt to justify his sealed documents beyond stating that they have been designated confidential pursuant to the Confidentiality Stipulation. Reliance on a boilerplate confidentiality order with no attempt to redact portions of the filings, however, is insufficient for a motion to seal, especially where it is connected with a motion for summary judgment.  *See Visual Mining, Inc. v. Ziegler*, No. PWG 12-3227, 2014 WL 690905, at *5 (D.Md. Feb. 21, 2014) (denying motion to seal when the only justification was that the documents are "confidential" under a court-approved Protective Order); *Under Armour, Inc. v. Body Armor Nutrition, LLC*, No. JKB-12-1283, 2013 WL 5375444, at *9 (D.Md. Aug. 23, 2013).  In an earlier decision in this case, the undersigned specifically noted that a party's reliance on a confidentiality order is

insufficient to satisfy the "specific factual representations" that Local Rule 105.11 requires. *Butler*, 876 F.Supp.2d at 576 n.18. Plaintiff Butler will have fourteen (14) days to file a renewed motion to seal with redacted versions or, alternatively, explain why one or more of these documents must be sealed in their entirety. Examining the documents, it is not apparent why portions of Defendants' employee handbook outlining the timekeeping, cellphone, and other policies relevant and relied upon by both parties in their unsealed briefs should be sealed. Other documents include the timesheets and earnings statements discussed above. Any documents capable of redaction, should be redacted to make public the information which supports that party's position.

## IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment will be granted in part and denied in part. Defendants' motion to seal will be granted in part and denied in part, while Plaintiffs' motion to seal will be denied. A separate order will follow.

/s/<br>
_____<br>
DEBORAH K. CHASANOW<br>
United States District Judge